PEOPLE *v.* ROXBOROUGH.

1. CRIMINAL LAW—DUE PROCESS—ONE-MAN GRAND JURY—PRELIMINARY EXAMINATION.

Due process of law was not denied defendant in prosecution for conspiracy to obstruct justice because circuit judge who had conducted one-man grand jury proceeding also acted as examining magistrate at preliminary examination, as the fact that such judge had conducted the one-man grand jury proceeding did not disqualify him from exercising statutory power to hold preliminary examination and no prejudice was shown at preliminary examination, a proceeding not required by the due-process clause of either the Federal or State Constitution (U. S. Const. am. 14; Mich. Const. 1908, art. 2, § 16; 3 Comp. Laws 1929, §§ 17118, 17217, 17218).

2. SAME—CONSPIRACY—SUFFICIENCY OF PEOPLE'S EVIDENCE—DIRECTED VERDICT.

In prosecution of defendant and others on charge of conspiracy to obstruct justice, evidence introduced by the people was sufficient to warrant denial of defendant's motion to direct a verdict at the close of the people's case.

3. CONSPIRACY—CRIMINAL LAW.

A conspiracy exists when two or more persons combine to do a criminal act.

4. SAME—CRIMINAL LAW—STATUTES.

When crime has been committed by one or more conspirators, each may be prosecuted therefor under statute abolishing the distinction between accessories and principals (3 Comp. Laws 1929, § 17253).

5. CRIMINAL LAW—CONSPIRACY—EVIDENCE.

In prosecution for crime where conspiracy exists, proof of conspiracy is but incidental to the proving of the crime itself and it need not appear that all of the parties got together and agreed upon the means for its accomplishment.

6. SAME—CONSPIRACY—SUFFICIENCY OF EVIDENCE.

> Evidence in prosecution for conspiracy to obstruct justice was sufficient to present questions of fact for consideration by the jury and to support its conviction of defendant.

7. CONSPIRACY—INFERENCES.

> A criminal conspiracy may be established by circumstances and may be based on inferences.

8. CRIMINAL LAW—ONE-MAN GRAND-JURY TESTIMONY—REFRESHING RECOLLECTION—IMPEACHMENT—STENOGRAPHER—DUE PROCESS—EVIDENCE.

> It was not reversible error nor a denial of due process for trial court in a prosecution for crime to permit the prosecution to use a transcript of one-man grand-jury testimony for the purpose of refreshing the recollection of witnesses or for impeachment purposes and then to deny defendant the right to cross-examine witnesses concerning their grand-jury testimony, since the defendant might have called either the judge or stenographer who participated in the one-man grand jury to testify whether or not the witnesses' testimony before the grand jury was different from that given by them at the trial (3 Comp. Laws 1929, §§ 17218, 17233).

9. SAME—ONE-MAN GRAND-JURY TESTIMONY—CROSS-EXAMINATION—RECORD.

> In prosecution for conspiracy to obstruct justice, defendant's assertion that the court erred in refusing him the right to cross-examine certain witnesses as to contradictory testimony given by them before a one-man grand jury is not discussed where portions of record referred to do not indicate an attempt was made to cross-examine such witnesses in manner alleged.

10. CONSPIRACY—STATEMENTS OF CONSPIRATORS—ADMISSION IN EVIDENCE—INSTRUCTIONS.

> Since one conspirator is chargeable with the acts of the others upon the principle which governs in the case of agency, where the object of the conspiracy has been attained, the rule of agency is no longer applicable and statements made by one, while admissible as against him, cannot be considered as evidence against the others, but the statements may be admitted in evidence as made and the jurors instructed that it is not to be considered on the question of guilt of the others.

11. CRIMINAL LAW—CONFESSIONS—CONSPIRACY.

> A confession of a conspirator must be received in evidence as made and if it implicates others and tends to prejudice them

such prejudicial effect is presumed to be obviated by proper instructions.

12. SAME—DEFENDANT AS WITNESS—WAIVER OF CONSTITUTIONAL PRIVILEGE AGAINST SELF-INCRIMINATION.

While one accused of crime may not be compelled to testify either on his own behalf or for the people, if he does elect to testify he has waived his constitutional right of refusing to answer any question material to the case even though the answer tends to prove him guilty of some other crime than that for which he is on trial. (Const. 1908, art. 2, § 16).

13. WITNESSES—SELF-INCRIMINATION.

One who is a coconspirator but is not a codefendant on trial for conspiracy and who becomes a witness for the State either voluntarily or under subpoena may not be thereby required to incriminate himself as to the commission of some other crime and may assert his constitutional privilege against self-incrimination (Const. 1908, art. 2, § 16).

14. JURY—PEREMPTORY CHALLENGES.

The right of peremptory challenge is not of itself a right to select, but a right to reject, qualified jurors and is exercised as a matter of favor to the challenger, who has no obligation to disclose any reason for its exercise (3 Comp. Laws 1929, § 17305).

15. SAME—PEREMPTORY CHALLENGES—NUMBER.

The number of peremptory challenges depends upon the discretion of the legislature and may vary according to the condition of different communities and the difficulties in them of securing intelligent and impartial jurors (3 Comp. Laws 1929, § 17305).

16. CRIMINAL LAW—CONSPIRACY—NEGROES—PEREMPTORY CHALLENGES—CONSTITUTIONAL LAW.

In prosecution for conspiracy to obstruct justice wherein some of the many defendants were members of the Negro race, the elimination of all Negroes from the jury through use of some of the peremptory challenges available to the people did not violate any constitutional rights of Negro defendants where they do not appear to have been excluded from the panel in any way, affidavit for new trial fails to show excused jurors were peremptorily challenged solely because of their race or color and jury acquitted some of defendants apparently without regard to race and there was no appeal to race prejudice on the part of the special prosecutor or anyone else (3 Comp. Laws 1929, § 17305).

17. SAME—CONSPIRACY—INSTRUCTIONS—WITNESSES WITH IMMUNITIES.

    In prosecution for conspiracy to obstruct justice, instruction that certain of the people's witnesses testified after having obtained statutory immunity against criminal prosecution through previously conducted one-man grand jury proceedings and that such fact bore upon credibility of such witnesses and which followed substance of appellant's request to charge was proper (Const. 1908, art. 2, § 16; 3 Comp. Laws 1929, § 17220).

18. SAME—CONSPIRACY—INSTRUCTIONS—FINDING AS TO INDIVIDUAL DEFENDANTS.

    In prosecution of many defendants for conspiracy to obstruct justice, instruction to jury that it was to pass on the guilt or innocence of each one separately and then announce to the court those who were guilty or not guilty did not take away from the jury its inviolable right to find all defendants guilty or all innocent.

Appeal from Wayne; Pugsley (Earl C.), J., presiding. Submitted October 14, 1943. (Docket No. 82, Calendar No. 42,085.) Decided December 29, 1943. Rehearing denied February 24, 1944. Application for certiorari to Supreme Court of Michigan denied by Supreme Court of the United States October 16, 1944.

John Roxborough was convicted of conspiracy to obstruct justice. Affirmed.

*Lloyd A. Loomis* and *Lewis, Rowlette & Brown,* for appellant.

*Herbert J. Rushton,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Thomas A. Kenney* and *Daniel J. O'Hara,* Assistants Attorney General, for the people.

BUSHNELL, J. Defendant John W. Roxborough and others appeal from a conviction under the

second count of an information which charged them with conspiracy to obstruct justice. In this opinion we shall consider only the appeal of defendant John W. Roxborough.

The chain of events leading up to the indictment, arrest, trial and conviction of Roxborough and those tried jointly with him is related in detail in *People v. McCrea,* 303 Mich. 213. The appeals of *Wilcox; Malone; Staebler; Stambaugh, Elliott, Lansberg; Way; Scaduto;* and *Garska,* also reported in 303 Mich. at pages 287,. 297, 298, 300, 303, 307, and 313, respectively, throw some light on the factual background. See, also, *People* v. *Robinson,* 306 Mich. 167, and *People* v. *Millman,* 306 Mich. 182.

The information filed on December 12, 1940, charged in count 1 that Roxborough and others maintained and operated "a certain lottery or gift enterprise for money, commonly known as 'policy' and/or 'mutuel,' 'numbers' and 'clearing house.'" The operation of lotteries in the county of Wayne had assumed such proportions that there were many policy and mutuel houses in existence. The record shows that one of the defendants, Peter Kosiba, an operator of a mutuel house known as "Western Union," had a commercial banking account with an average monthly balance of approximately $38,000, and that the deposits in this account from March 21, 1938, to March 1, 1940, totalled $735,406.44.

The second count charged the same defendants with conspiracy among themselves and other persons not named as defendants "to procure the wilful, intentional and corrupt failure, omission and neglect on the part of" certain public officials named therein "to perform their respective official duties as public officials of said county and city, respectively, in the enforcement of the criminal laws of the State relating to lotteries."

The people elected to go to the jury only on the second count of the information, on which charge defendant Roxborough was convicted and sentenced to a term of 2½ to 5 years. All of the questions raised on his appeal will be considered except the ones relating to venue, which are answered in the opinion rendered herewith in the case of *People* v. *Watson, post,* 596.

Roxborough's first contention is that former Circuit Judge Homer Ferguson, who conducted the so-called "one-man" grand jury * and issued the warrant, was thereby disqualified from conducting his preliminary examination.† This question was considered in the *McCrea Case,* 303 Mich. 213, 248, and it was there held that former prosecutor, McCrea, was not denied due process by reason of the fact that the judge who conducted the grand jury proceedings presided at his preliminary examination, ordered him held for trial, and filed a presentment with the governor for his removal from office. We say here, as we said there, that:

"Our attention has not been called to any act or conduct on the part of Judge Ferguson, while conducting the preliminary examination, from which prejudice or bias could be inferred. Furthermore, the law is well settled that the due-process clauses of the Federal and State Constitutions do not require a preliminary examination in criminal proceedings."

See authorities therein cited.

The next question propounded by appellant is stated as follows:

"Was there sufficient evidence against appellant at the close of the people's case to deny his motion

---

*See 3 Comp. Laws 1929, §§ 17217, 17218 (Stat. Ann. §§ 28.943, 28.944).—REPORTER.

† See 3 Comp. Laws 1929, § 17118 (Stat. Ann. § 28.843).—REPORTER.

for directed verdict and submit the matter to the jury?''

Among other testimony presented in support of the people's charge that Roxborough conspired with others to obstruct justice is the testimony of William L. Anderson, who was ''engaged in the operation of a policy or numbers.'' He testified as follows:

''In volume 39 of the grand jury testimony, session of Thursday, November 30, 1939, page 4142, which I am using to refresh my recollection, I used the same words I used a while ago, have to take care of somebody, but I didn't know who it was, and John Roxborough told me I would have to give him $100 a month. * * *

''Roxborough said I would have to give him $100 a month to take downtown, and it was not a loan I was paying back. I never paid the loan, never said no more about it. * * *

''I had an arrangement with John Roxborough to give him $100 a month, which I supposed was used in the Big Four name. He told me that I would have to pay $100, that he would have to take it downtown, that once a month I would have to pay it. * * *

''*Q.* Did you, at any time, give John Roxborough this $100 a month, after he told you that you would have to, for the Big Four, for the purpose of paying him back any money you owed him?

''*A.* No. * * *

''This $100 a month that I paid to Roxborough was handled this way: We have a fund to subtract, like you subtract the winnings, and you cut the money up. You subtract a certain amount from the total, that is, a total from it, and then I would take it from this total, and I had a fund to put it in to pay all such bills. It wasn't charged off as expense at all insofar as my partners were concerned, and it was left to me to keep the funds. Whenever they had a $1,000 winner, I would subtract the thousand dollars

from that, and I would charge that on the sheet as $1,000 win, and then I would take $100 from that, and put it in this fund. Sometimes I would have seven or eight hundred dollars in the fund, and if I had to pay him anything like that, I would take it out of this fund, and it was taken out of the company funds when I was paying this money. One third of it was my own personal money, and speaking about the $100 that went to John Roxborough personally, one-third belonged to Mr. Williams, one-third to Mr. Mitchell, and the other third, myself, and I would pay this money to John Roxborough along Beacon street anywhere. He would have to come downtown for me to see him, because I didn't go out to his house. I also paid fines and releases in addition to this $100.''

Walter Norwood, who ''was engaged in the mutuel and policy business,'' testified

''I have known John Roxborough for 20 years and Everett I. Watson for about 15 years. I knew William Mosley, Brumal Penick and William Robinson and attended a meeting with these men in 1935, together with a man by the name of Nelson, at the Waiters' and Bellmen's Club. Duncan McCrea was prosecutor at that time. The purpose of the meeting was that word had been brought to us that the prosecutor wanted us to contribute to him so that we could keep the Italian boys out of the numbers. We delegated Penick and Watson to go to the prosecutor's office.    *    *    *

''I know Mr. McBride with the Great Lakes. I had a conversation with him and then I talked to John Roxborough. Mr. McBride had a talk with me in December, 1938, and I guess this was in the same month I had a talk with John Roxborough; at that time he said I would have to pay McCarthy more money, that he had talked to McCarthy and told him he didn't need any collectors and that we would pay our own. Following that conversation

with Roxborough I paid McCarthy $50 every month, paid it to Watson, and once it was sent to John Roxborough's office, which continued up until the grand jury started. During the time I was operating from 1935 to 1939 John McCarthy never raided me nor pushed me around or bothered me.''

Roxborough argues that—

''There was absolutely no evidence of any understanding, agreement, or combination whatsoever between appellant and any public officers to bribe them into neglect of their duties. Without such understanding, agreement, or combination, the crime of conspiracy cannot, of course, exist. The mere suspicion of appellant's conduct will not suffice to send the case to the jury.''

Without further discussion of other testimony, that which has just been referred to was sufficient to justify denial of appellant's motion for a directed verdict.

As said in *People* v. *Knoll,* 258 Mich. 89, 95:

''A conspiracy exists when two or more persons combine to do a criminal act; and, when the crime has been committed by one or more of them, under the statute * above quoted, each may be prosecuted therefor. The proof of the conspiracy in such a case is but incidental to the proving of the crime itself. It need not appear that all of the parties got together and agreed upon the means for its accomplishment.

'' 'The existence of the assent of minds which is involved in a conspiracy may be, and, from the secrecy of the crime, usually must be, inferred by the jury from proof of facts and circumstances which, taken together, apparently indicate that they are merely parts of some complete whole.' '' (Underhill's Criminal Evidence [3d Ed.], p. 951.)

* See 3 Comp. Laws 1929, § 17253 (Stat. Ann. § 28.959).—RE-PORTER.

The testimony of the various witnesses presented questions of fact for consideration by the jury and the record contains sufficient testimony from which the jury could find Roxborough guilty as charged.

"Conspiracy may be established by circumstances and may be based on inferences." *People* v. *Robinson,* 306 Mich. 167, 175.

The trial judge did not err in denying the motion for a directed verdict.

It is asserted that the trial judge erred "in permitting the people to refresh the recollection of their witnesses and to impeach them by use of the grand jury minutes while at the same time limiting their use by appellant."

This same contention was discussed in the *McCrea Case* and it was pointed out that the transcript of the grand jury testimony was used in the manner repeatedly recognized in this State. See authorities cited in the *McCrea Case* at page 244. We there stated the statutory manner in which the defendant could have made use of the grand jury testimony for the purpose of impeachment. The trial in the instant case was conducted by the same circuit judge who conducted the trial in the *McCrea Case.* The trial court's ruling with respect to the use of such testimony was correct.

Roxborough claims that the court erred in refusing him the right to cross-examine certain witnesses as to contradictory testimony given by them before the grand jury. The argument in appellant's brief in support of this claim of error contains references to certain pages of the record, an examination of which does not indicate that any attempt was made to cross-examine these witnesses in the manner alleged.

Statements of certain defendants, tantamount to confessions, were submitted to the jury over Roxborough's objection. These statements were made under such circumstances that would bind only the ones who made them, although they contained the mention of Roxborough's name. He contended before the trial court that his name should be deleted therefrom and argues now that the court's refusal to delete constituted prejudicial error. This practice is discussed in 7 Wigmore on Evidence (3d Ed.), § 2100, as follows:

"Since confessions are not admissible against third persons, the names of other co-indictees, mentioned in a confession used and read against the party making it, were by most English judges ordered to be omitted. But by other judges the names were ordered read and the jury instructed not to use the confession against them. In Canada and the United States the latter practice is favored."

1 Gillespie's Michigan Criminal Law & Procedure, p. 449, in § 376, has this to say:

"One conspirator is chargeable with the acts of the others, upon the principle which governs in the case of agency, but where the object has been attained, the rule of agency is no longer applicable, and statements made by one, while admissible as against him, cannot be considered as evidence against the others. In such cases it is not error to admit the statement, but the jurors should be instructed that it is not to be considered on the question of the guilt of the others."

See *People* v. *Arnold,* 46 Mich. 268, 277; *People* v. *Maunausau,* 60 Mich. 15, 18; *People* v. *Austin,* 221 Mich. 635, 645; *People* v. *Cardella,* 233 Mich. 505,

513. See, also, *People* v. *Beller,* 294 Mich. 464, 469; *People* v. *Garska,* 303 Mich. 313, 319.

In *State* v. *Crossman,* 189 Wash. 124 (63 Pac. [2d] 934), the court said:

" 'The rule is very clear that the confession must be given as made. If we strike out any part, then the confession ceases to be the confession as made. The rule in such cases is clearly to let all the defendant said be given, and the jury cautioned not to consider it against anyone except the man who makes it.' *State* v. *Jeffords,* 121 S. C. 443 (114 S. E. 415)."

In *State* v. *Smith,* 201 Wis. 8 (229 N. W. 51), relying on 1 R. C. L. p. 574, the rule is stated:

"That, where two are tried jointly, a confession of one is admissible against him, although it implicates the other and tends to prejudice him. The prejudicial effect against the other is presumed to be obviated by an instruction such as was given here."

See, also, 20 Am. Jur. § 493, p. 427.

In support of his argument, appellant quotes from *People* v. *Hepner,* 285 Mich. 631, 641. That case, however, is distinguishable on its facts, and a new trial was granted there because the court received in evidence a portion of a prior self-serving statement of Hepner without including all of the relevant parts thereof, and then refused to permit other defendants implicated thereby "to cross-examine the stenographer so as to bring out Hepner's entire statement."

When the statements were received in the instant case the court cautioned the jury at the time, saying:

"I caution you that these statements are not to be considered as evidence against any parties except the ones who made the statements."

In the final instructions to the jury the court again referred to the matter and charged the jury as follows:

"During the course of the trial statements purporting to have been signed by several of the defendants were received in evidence and read to you. At that time, I instructed you and I now repeat that any statements contained therein could only be considered as binding upon and as evidence against the party who made the statement. Those were made at such a time, in such manner, and under such circumstances as would preclude them from being used as evidence against or to the injury of any of the other defendants in this case."

The trial court did not err in adhering to the foregoing approved practice.

Roxborough claims that he was deprived of his constitutional right of "confrontation" when the court refused to compel coconspirators, sworn as witnesses for the people, to answer questions which they claimed were incriminating. These witnesses had been given immunity and were not defendants in the cause. This same question was raised and decided in *People* v. *Robinson,* 306 Mich. 167, 175, as follows:

" 'Where a coconspirator has become a witness for the people, can he, after making partial disclosure of the facts, refuse to answer further questions on the ground that they may incriminate him, particularly where such questions relate to facts material to the defense and to the impeachment of this witness as well as other witnesses of the people?'
* * *

"One who is on trial for a crime cannot be compelled to testify, either on his own behalf or for the people. However, if he elects to do so, he is held to have waived his constitutional right of refusing to

answer any question material to the case, even though the answer tends to prove him guilty of some other crime than that for which he is on trial. *People* v. *Dupounce,* 133 Mich. 1 (103 Am. St. Rep. 435, 2 Ann. Cas. 246); *People* v. *Gray,* 135 Mich. 542; *People* v. *Koukol,* 262 Mich. 529 (87 A. L. R. 878). But one who is not a codefendant, while he may turn State's evidence and become a voluntary witness on behalf of the State, is not thereby required to incriminate himself as to the commission of some other crime and he may assert his constitutional privilege. Brouillet and Farrish, coconspirators but not codefendants, if found within the jurisdiction of the court could be subpoenaed as witnesses and compelled to testify or subject themselves to commitment for contempt. They should not be compelled to convict themselves of another crime in giving such testimony or suffer the alternative of jail for refusal to answer incriminating questions.''

The next question raised by Roxborough is stated as follows:

''Where the prosecution excludes from a trial jury, solely because of race, every Negro selected, has a Negro defendant been deprived of due process and equal protection of the laws?''

Because of the importance of this question, we quote *in extenso* from appellant's brief as follows:

''Appellant and 60 other defendants were tried together in the lower court. Almost two weeks were consumed in selecting a jury, in the course of which several jury panels totaling approximately 300 members were practically exhausted. Although on this panel there were more than 30 Negroes, presumptively qualified to serve, each and every one' of them selected for the trial jury was peremptorily challenged by the prosecution. Since the prosecution had upwards of 300 peremptory challenges, it was in a position to, and did, exclude from the

trial jury every Negro called. No cause was shown for the excusal, and only few persons other than Negroes were peremptorily discharged by the prosecution. Every member then of appellant's race, although not disqualified, was effectively excluded.

"During the selection of the jury appellant objected to the prosecution's right to control the membership of the jury and at the conclusion of the case moved for a new trial on the ground, among others, that the prosecution had thus deliberately and purposefully excused every Negro juror selected, for the reason that it believed they would favor the defendants. That motion was supported by the affidavit of John R. Williams, the editor of a weekly Negro newspaper, wherein he deposed (2377):

" 'That during this conference the following question was asked by your deponent and the following answer made by Chester P. O'Hara as near as your deponent can remember same verbatim with respect to the matters heretofore set out:

" '*Q.* Mr. O'Hara, how does it happen that you have continually for days excused only the Negro jurors who have been called for service in this case when so many of them are without question as qualified as any of the others who have been called?

" '*A.* The Roxborough-Watson interests are so wide that I prefer that I do not have any Negroes on the jury and further practically every Negro in Detroit is a number or policy player anyhow, and as such is unfit to serve on a case involving such matters.' "

Although no objection was made before the jury was sworn, appellant's counsel did, however, at the conclusion of the cause, file a written motion for a new trial, stating as one of the grounds the following:

"Because of the prejudicial conduct of the prosecution in peremptorily discharging every Negro

juror who was called to sit in the panel of jurors being selected to try this cause when many of them were otherwise qualified, thus indirectly violating the Constitutional rights guaranteed to this defendant by article 6 of the bill of rights of the Constitution of the United States and section 19 of article 2 of the Constitution of the State of Michigan."

This motion was denied by the trial judge in the following language:

"As to the peremptory challenges exercised by the people of Negroes called to the jury box, it is the opinion of this court that the people were entirely within their rights and there was no attempt to bias anybody by such action. No cause need be alleged for peremptory challenge and the people were entitled to more than 300 peremptory challenges, exercising less than one-third thereof. In the opening statement by the prosecution an attempt was made by the prosecution to insure no bias or prejudice against any of the defendants and such attempt was stopped by objection of defense counsel. This court having observed the proceedings and having conducted the examination of the jurors cannot see wherein any defendant was injured by this legal action of the prosecution. It is also obvious from the verdicts rendered, in which certain Negro defendants as well as white ones, were acquitted, that there was no color line or distinction drawn by the jury."

In the instant case we are solely concerned with the exercise of peremptory challenges by the people, and not with the selection of members of the jury by the jury commission, as was the situation in *Norris* v. *Alabama,* 294 U. S. 587 (55 Sup. Ct. 579, 79 L. Ed. 1074), and *Hill* v. *Texas,* 316 U. S. 400 (62 Sup. Ct. 1159, 86 L. Ed. 1559), where showing was made that members of the Negro race were system-

atically excluded from the jury lists either by law
or administrative practice.

The right of peremptory challenge is an important
one, and is stated in the statute as follows:

"Any person who is put on trial for an offense
which is not punishable by death or life imprison-
ment shall be allowed to challenge peremptorily five
of the persons drawn to serve as jurors and no
more; and the prosecuting officers on behalf of the
people shall be allowed to challenge peremptorily
in such cases five of such jurors and no more.  In
cases involving two or more defendants who are
being jointly tried for such an offense, each of said
defendants shall be allowed to challenge peremptorily
five persons returned as jurors and no more; and
the prosecuting officers on behalf of the people shall
be allowed to challenge peremptorily as many times
five of the persons returned as jurors as there may
be defendants being so jointly tried."  3 Comp.
Laws 1929, § 17305 (Stat. Ann. § 28.1035).

In considering this right, Mr. Justice Story,
speaking for the court in *United States* v. *Marchant
& Colson,* 12 Wheat. (25 U. S.) 480 (6 L. Ed. 700),
said:

"The right of peremptory challenge is not of
itself a right to select, but a right to reject jurors.
It excludes from the panel those whom the prisoner
objects to, until he has exhausted his challenges, and
leaves the residue to be drawn for his trial accord-
ing to the established order or usage of the court.
The elementary writers nowhere assert a right of
this nature in the prisoner, but uniformly put the
allowance of peremptory challenges upon distinct
grounds.  Mr. Justice Blackstone in the Commen-
taries (4 Blackstone, Commentaries, p. 353) puts it
upon the ground, that the party may not be tried by
persons against whom he has conceived a prejudice,

or who, if he has unsuccessfully challenged them for a cause, may, on that account, conceive a prejudice against the prisoner. The right, therefore, of challenge, does not necessarily draw after it the right of selection, but merely of exclusion. It enables the prisoner to say who shall not try him; but not to say who shall be the particular jurors to try him.''

Some time later the same court, in discussing the same matter, said in *Hayes* v. *Missouri,* 120 U. S. 68, 69 (7 Sup. Ct. 350, 30 L. Ed. 578):

''The Constitution of Missouri, and, indeed, every State of the Union, guarantees to all persons accused of a capital offense, or of a felony of lower grade, the right to a trial by an impartial jury, * * * and this implies that the jurors shall be free from all bias for or against the accused. * * * To prescribe whatever will tend to secure the impartiality of jurors in criminal cases is not only within the competency of the legislature, but is among its highest duties. It is to be remembered that such impartiality requires not only freedom from any bias against the accused, but also from any prejudice against the prosecution. Between him and the State the scales are to be evenly held.

''Experience has shown that one of the most effective means to free jury box from men unfit to be there is the exercise of the peremptory challenge. The public prosecutor may have the strongest reasons to distrust the character of a juror offered, from his habits and associations, and yet find it difficult to formulate and sustain a legal objection to him. In such cases, the peremptory challenge is a protection against his being accepted.

''The number of such challenges must necessarily · depend upon the discretion of the legislature, and may vary according to the condition of different communities and the difficulties in them of securing intelligent and impartial jurors. The whole matter is under its control. * * *

"The accused cannot complain if he is still tried by an impartial jury. He can demand nothing more.   *   *   *.   The right to challenge is the right to reject, not to select a juror. If, from those who remain, an impartial jury is obtained, the constitutional right of the accused is maintained."

Our court took the same position in *O'Neil* v. *Lake Superior Iron Co.,* 67 Mich. 560, saying:

."Peremptory challenges are exercised by a party, not in the selection of jurors, but in rejection. It is not aimed at disqualification, but is exercised upon qualified jurors as a matter of favor to the challenger."

And in *People* v. *Eggleston,* 186 Mich. 510, that—

"the right of peremptory challenge imposes upon counsel who exercise that right no obligation to assign any reason for its exercise."

The case most nearly in point is *Whitney* v. *State,* 43 Tex. Crim. 197 (63 S. W. 879), where the court said:

"It appears in the motion for new trial that there were three Negroes on the panel to try defendant, and these were peremptorily challenged by the State. This, under our statute, the State had a perfect right to do without assigning any reason; nor do we understand that this could be construed into any discrimination against the Negro race. To so hold would be equivalent to guaranteeing a Negro defendant a certain number of Negroes on the jury to try him. We do not understand this to be the construction of the Fourteenth Amendment by the Supreme Court of the United States."

The reason counsel may have for exercising peremptory challenges is immaterial. This right has been granted by law, and it may be exercised in any manner deemed expedient, and such action does

not violate any of the constitutional rights of an accused. If appellant's argument is carried to its logical conclusion, it would do away with the basic attribute of the peremptory challenge, because, if such argument is accepted in all cases involving defendants of the Negro race, the prosecutor, upon challenging prospective jurors of that race, would either have to assign a cause for such challenge or take the risk of a new trial being granted on the ground that he discriminated because of color; as a result, no one could safely peremptorily challenge a juror where the defendant was of the same race as the juror. This right, claimed by Roxborough, would extend to members of his race a privilege that is not granted to any other race or class. It is apparent, therefore, that appellant's position is untenable. Furthermore, no claim is made that members of the Negro race were in any way excluded from the jury panel, and the affidavit presented in support of the motion for a new trial falls far short of showing that the excused jurors were peremptorily challenged solely because of their race or color.

In his opening statement to the jury, while the matter of peremptory challenge was fresh in their minds, the prosecuting attorney said:

"Please at no time draw the color line, and don't think that we do. We are here to present this case purely and simply on the facts and if we prove it beyond a reasonable doubt, you have a certain duty to perform and if we don't, you have another duty to perform. But don't misunderstand the situation which you have watched day in and day out as you sat in this jury box and don't draw the color line for one single second against a single defendant sitting out there in that audience. We want this case to be decided on the facts. If they are guilty, we want justice done to them, and if they are not

guilty, we want them out on the street walking around.''

We cannot find in this record any appeal to race prejudice on the part of the special prosecutor or any one else.

The court was requested to charge the jury that—

''Any witness for the State who has been granted immunity in this cause cannot now or at any time hereafter, be prosecuted for the offense here charged, or for any other crime disclosed by the testimony given by him, and you should consider this fact in determining whether or not you will believe his testimony.''

Instead, the jury was instructed as follows:

''It has been brought to your attention that certain witnesses who were produced by the people have previously obtained immunity and protection against criminal prosecution through proceedings previously conducted before Circuit Judge Homer Ferguson acting as a so-called one-man grand jury. You have a right to take these facts into consideration for such bearing as they may have upon the credibility of such witnesses and for no other purpose. Such immunity from prosecution was granted pursuant to law under a statute applicable to grand jury proceedings.''

The instruction given follows the substance of appellant's request and conforms to the ruling of the court in *People* v. *McCrea,* 303 Mich. 213, 253–256.

In conclusion, appellant claims that the trial judge erred in his final instruction to the jury.

''I now turn over to you a printed list containing the names of the 41 defendants. *You will pass on the guilt or innocence of each one separately, and when you have done so you will return and announce to this court the ones, if any, whom you find guilty, and those, if any, whom you find not guilty.* In

form your verdict will be, we find the following defendants, naming them, guilty as charged, and we find the following defendants, naming them, not guilty."

Roxborough argues that this portion of the charge "took away from the jury its inviolable right to find all defendants guilty or all defendants innocent." That portion of the charge which we have italicized adequately protected the rights of appellant.

We find no reversible error and the judgment is affirmed.

Boyles, C. J., and Chandler, North, Starr, Wiest, Butzel, and Sharpe, JJ., concurred.