**HALL v. UNITED STATES.**

GRAY v. SAME.

HARRIS v. SAME.

Nos. 9584, 9589, 9590.

United States Court of Appeals
District of Columbia.

Argued Nov. 26, 1947.

Decided April 5, 1948.

Writ of Certiorari Denied June 14, 1948.

See 68 S.Ct. 1509.

Mr. Curtis P. Mitchell, of Washington, D. C., for appellant in No. 9584.

Mr. James T. Wright, of Washington, D. C., with whom Mr. Wesley S. Williams, of Washington, D. C., was on the brief, for appellant in No. 9589.

Mr. Robert I. Miller, of Washington, D. C., for appellant in No. 9590.

Mr. Sidney S. Sachs, Asst. U. S. Atty., of Washington, D. C., with whom Messrs. George Morris Fay, U. S. Atty., John W. Fihelly, and Edward Molenof, Asst. U. S. Attys., all of Washington, D. C., were on the brief, for appellee.

Before EDGERTON, CLARK, and WILBUR K. MILLER, Associate Justices.

WILBUR K. MILLER, Associate Justice.

Henry McDowell's .38-calibre revolver was stolen from his residence in the District of Columbia during the daylight hours of Tuesday, March 11, 1947. When Preston Barnes was arrested for the theft a few days later, a story of murder began to unfold. With the revolver in his possession, Barnes had been in company on that Tuesday with the appellants Joe Gray and Shirley Harris. The weapon was turned over to Gray, who hid it under the mattress on his mother's bed. Eight bullets, which also had been stolen from McDowell, were handed to Harris, who took them to his home on W Street near 14th Street.

That evening about 9:00 o'clock the appellant Herbert Hall was calling on his friend Ida Brown. Harris appeared about 9:30. He and Hall left together and proceeded to Gray's home where Harris took charge of the revolver. Gray joined them and the three went on to the home of Harris, obtained the bullets, loaded the revolver, and discussed plans for the remainder of the evening. A suggestion that a store be robbed was discarded in favor of holding up some person on the street. With this in mind, they set out in search of a victim. Proceeding along 14th Street to Euclid, they turned into that street and, as they reached 13th Street, Harris stated they would rob the first man they saw "by themselves."

At the corner of 11th and Euclid Streets their search ended, for there they saw Frank C. Kelly, who had just attended a meeting at nearby Central High School, standing at a car stop on 11th Street. Hall paused near the corner to attend to a personal need, but Harris and Gray went on to the car stop. Threatening Kelly with the revolver, Harris commanded him to "Stick 'em up." Hall was then half way across the street on his way to join his companions. Kelly turned to run but had taken only a few steps when Harris shot him in the back; he fell forward on his face, bleeding profusely, and died almost immediately. The three bandits fled and reassembled at Banneker playground, a few blocks from the scene of the shooting, where the unused bullets were extracted from the revolver, after which Hall disposed of both weapon and ammunition by dropping them in a sewer near the corner of 9th Street and Barry Place. By 10:30 p. m. Hall was back at the home of Ida Brown. He told her he had just seen a white man shot at 11th and

Euclid Streets but that he had not done the shooting.

Gray was arrested Saturday afternoon, March 15, and the other two appellants were taken into custody early in the morning of Sunday, March 16. All three confessed to the police that afternoon and signed written statements. Hall accompanied police officers to 9th Street and Barry Place and pointed out the sewer where he had disposed of the revolver. Scientific tests showed that the bullet which killed Kelly, and which was taken from his throat, had been fired from the revolver which the police recovered from the sewer. The weapon was identified as being that which was stolen from McDowell and which had been handled during that day by Preston Barnes and the three appellants.

The appellants were jointly indicted for murdering Kelly in an attempt to rob him, which in this jurisdiction is murder in the first degree.[1] They were tried together and were found guilty by a jury in the District Court of the United States for the District of Columbia. This appeal is from the death sentence pronounced pursuant to that verdict.

██ The sole ground for reversal relied upon by Harris is that the trial court erred in receiving evidence of an offense other than that for which he was on trial, the reference being to evidence that the revolver was stolen from McDowell's home. The other two appellants make the same contention. The short answer to it is that there was no evidence to the effect that any one of the appellants had burglarized McDowell's residence and stolen his revolver. Preston Barnes admitted that he was being held for housebreaking and larceny, and Henry McDowell testified that his revolver was stolen on March 11. We see no room for an inference from that evidence that the appellants had committed burglary and lar-

ceny. To be sure, there was proof that the appellants had possession during the day of March 11 of the revolver which McDowell later identified as his own, but there was no intimation in the testimony that the appellants knew it had been stolen. Consequently, since there was no suggestion in the evidence that any appellant had stolen the revolver, or had received it knowing it to have been stolen, there was no evidence tending to charge them with, or prove them guilty of, an offense other than that for which they were on trial.

██ Hall and Gray assert that their motions for severance were improperly denied. It is the general rule that persons jointly indicted should be tried together, and granting separate trials is a matter of discretion. The mere fact that admissions have been made by one which are not evidence as against the others is not a conclusive ground for ordering the parties to be tried separately. Lucas v. United States, 70 App.D.C. 92, 104 F.2d 225. Nothing in the present record indicates an abuse of discretion in ordering the appellants to be tried together. The court duly limited the effect of evidence introduced which was competent against one defendant and incompetent as to the others.

██ The appellants took the stand and testified that the confessions which had been introduced into evidence against them were extorted from them by brutal beatings. But Gray's attorney stated it to be his position that the written statements were true in the main, and under his questioning Gray said certain officers had struck him, but that the policeman to whom he confessed did not lay a hand on him, and it was that officer's kind treatment which impelled him to give correct answers. Harris and Hall told the jury their statements were extorted by physical mistreatment, and Hall now says that his statement was exculpatory on-

---

[1] Title 22, § 2401, D.C.Code (1940): "Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison, or in perpetrating or attempting to perpetrate any offense punishable by imprisonment in the penitentiary, or without purpose so to do kills another in perpetrating or in at- tempting to perpetrate any arson, as defined in section 22–401 or 22–402 of this Code, rape, mayhem, robbery, or kidnapping, or in perpetrating or in attempting to perpetrate any housebreaking while armed with or using a dangerous weapon, is guilty of murder in the first degree."

ly and not an admission. His testimony did not differ greatly from his written statement and was enough in our opinion to amount to a confession of guilt.

All the officers denied having mistreated the appellants in any manner, and photographs of Harris and Hall taken a few minutes after the confessions were signed did not reveal bruises of brutality which they claimed had been inflicted. Moreover, the testimony of witnesses, other than the officers, who saw the appellants at the jail was to the effect that they bore no marks of beatings and that none of them complained of mistreatment. In a carefully and accurately worded charge the trial judge submitted to the jury the question whether the confessions of Harris and Hall had been extorted by beatings or any other sort of coercion or influence. The verdict of guilty indicates that the jury did not believe their story of having been forced to confess.

 It is argued by Hall and Gray that the court erred in refusing to grant a new trial because government counsel peremptorily challenged nineteen Negro members of the jury panel and so excluded Negroes from the jury. This, they say, violated their constitutional rights under the Fifth and Fourteenth Amendments. The Fourteenth Amendment is, of course, wholly inapplicable; but the due process clause of the Fifth Amendment would be invokable if the authorities charged with the duty of selecting jurors had systematically excluded Negroes from the panel.[2] The fact that nineteen members of that race were on the panel demonstrates that there was no such exclusion here. The requirements of due process were met when there was no racial discrimination in the selection of the veniremen. The government as a litigant was entitled to exercise twenty peremptory challenges, which means that its counsel could exclude from the jury that number of persons without assigning, or indeed without having, any reason for doing so. The Constitution does not require that the appellants, being Negroes, should be tried by a jury composed of or including members of that race.[3] They legitimately sought to obtain the fancied advantage of having Negroes on the jury by using their peremptory challenges only against white members of the panel.

 Although it is novel in this jurisdiction, the same contention concerning peremptory challenging of Negro jurors by the prosecution was presented to and rejected by the Supreme Court of Michigan in People v. Roxborough, 307 Mich. 575, 12 N.W.2d 466, 473, certiorari denied, sub nom. Roxborough v. Michigan, 1944, 323 U.S. 749, 65 S.Ct. 80, 89 L.Ed. 600. The court pointed out that peremptory challenges are exercised by a party, not in the selection of jurors, but in rejection. The peremptory challenge is not aimed at disqualification, but is exercised on qualified jurors as a matter of favor to the challenger. If the appellants' theory were correct and were carried to its ultimate logical result, it would be a violation of the Constitution for any prosecuting attorney peremptorily to challenge a Negro juryman if the defendant happened to be a Negro. This, as the Michigan court remarked, would "extend to members of [the Negro] race a privilege that is not granted to any other race or class." See also Whitney v. State, 43 Tex. Cr.R. 197, 63 S.W. 879. We conclude, therefore, that the appellants' argument of unconstitutional peremptory challenging is wholly untenable.

 Hall and Gray assert that the court erred in not granting their motion for a directed verdict at the close of the government's case but, as they waived the motion by taking the stand in their own behalf,[4] it is unnecessary to consider the alleged error.

 The same two appellants complain that government counsel was guilty of mis-

---

[2] Defendants under our criminal statutes are not entitled to demand representatives of their racial inheritance upon juries before whom they are tried. But such defendants are entitled to require that those who are trusted with jury selection shall not pursue a course of conduct which results in discrimination "in the selection of jurors on racial grounds." Akins v. Texas, 325 U.S. 398, 403, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692.

[3] See n. 2.

[4] Ladrey v. United States, 81 U.S.App. D.C. 127, 155 F.2d 417.

conduct in exhibiting Kelly's clothing to the jury, and in other respects. It was not improper to let the jury see the bullet hole in the back of Kelly's coat, since the appellants were suggesting the possibility that he died of a heart attack. A careful search of the record reveals no misconduct on the part of counsel for the government nor do we find anything to sustain Hall's complaint that his cross-examination of government witnesses was unduly restricted.

█ Hall also argues that because he threw away the gun and bullets after the murder, the jury should have been told that it might find him guilty as an accessory after the fact. But Hall himself said that, when they saw Kelly at 11th and Euclid Streets, Harris had the revolver and that his own plan was "just to look out for anybody that comes." That and other circumstances stamp him as an accessory before the fact and therefore guilty as a principal. Title 22, § 105, D.C.Code (1940).

We have examined the record with great care and have discovered no prejudicial error. The appellants were fairly tried. Their rights were fully protected by the trial judge. Their guilt having been amply proved by competent evidence, they must pay the penalty which the law exacts.

Affirmed.

EDGERTON, Associate Justice (dissenting).

"The American tradition of trial by jury * * * contemplates an impartial jury drawn from a cross-section of the community. * * * This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. * * * Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury."[5] "It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community."[6]

"The Congress on March 1, 1875, enacted that 'no citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State, on account of race, color, or previous condition of servitude;' and made it a crime for any officer to exclude any citizen on those grounds.[7] 18 Stat. 336—37, 8 U.S.C. § 44. For us the majestic generalities of the Fourteenth Amendment are thus reduced to a concrete statutory command when cases involve race or color which is wanting in every other case of alleged discrimination. * * * A Negro who confronts a jury on which no Negro is allowed to sit * * * might very well say that a community which purposely discriminates against all Negroes discriminates against him."[8] "For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government."[9]

The Supreme Court has also said: "It is the State's function, not ours, to assess the evidence against a defendant. But it is our duty as well as the State's to see to it that throughout the procedure for bringing him to justice he shall enjoy the protection which the Constitution guarantees."[10] And

---

5 Thiel v. Southern Pacific Co., 328 U. S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181, 166 A.L.R. 1412.

6 Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84.

7 "and any officer or other person charged with any duty in the selection or summoning of jurors who shall exclude or fail to summon any citizen for the cause aforesaid shall, on conviction thereof, be deemed guilty of a misdemeanor * * *."

8 Fay v. New York, 332 U.S. 261, 282–283, 293, 67 S.Ct. 1613, 1625.

9 Smith v. Texas, supra note 6, 311 U.S. at page 130, 61 S.Ct. at page 165.

10 Hill v. Texas, 316 U.S. 400, 406, 62 S.Ct. 1159, 1162, 86 L.Ed. 1559.

"over federal proceedings we may exert a supervisory power with greater freedom to reflect our notions of good policy than we may constitutionally exert over proceedings in state courts." [11]

The quoted cases involved systematic exclusion of Negroes or other groups from jury lists or panels. But the spirit and purpose as well as the letter of those cases forbid systematic exclusion of Negroes from a jury that tries Negroes. The rule against excluding Negroes from the panel has no value if all who get on the panel may be systematically kept off the jury. The government impliedly admits [12] that all Negroes were systematically excluded from the jury that tried the Negro appellants. Nineteen Negroes and no other persons were challenged peremptorily by the government. Whether this discrimination against Negroes did or did not violate the Act of Congress [13] I think it violated the plainly expressed policy of Congress, the plainly expressed policy of the Supreme

Court, the prosecutor's obligation of fairness,[14] and the due process clause of the Fifth Amendment. These principles, which the court overlooks, collide with the principle on which the court relies. The question is whether they limit it or it limits them.

In other respects I concur in the opinion of the court. The trial was otherwise fair and a properly chosen jury would doubtless have convicted the appellants. But "reversible error does not depend on a showing of prejudice in an individual case. The evil lies in the admitted exclusion of an eligible class or group in the community in disregard of the prescribed standards of jury selection. * * * The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." [15] I believe the prosecutor's unfortunate error makes a new trial necessary.

---

[11] Supra note 8, 332 U.S. at page 287, 67 S.Ct. at page 1627. Cf. McNabb v. United States, 318 U.S. 332, 340, 63 S. Ct. 608, 87 L.Ed. 819; United States v. Mitchell, 322 U.S. 65, 68, 64 S.Ct. 896, 88 L.Ed. 1140.

[12] The government's brief says: "Appellants Gray and Hall maintain their constitutional rights were violated by the prosecution's systematic exclusion of Negroes from the jury. (Hall Br. 18; Gray Br. 23.) In this connection they assert that the prosecution exercised nineteen of its allotted twenty peremptory challenges and in each case challenged a Negro." The brief attacks appellants' proposition of law but does not question their account of the facts.

[13] Note 7, supra.

[14] "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. * * * He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 632, 79 L.Ed. 1314.

[15] Ballard v. United States, 329 U.S. 187, 195, 67 S.Ct. 261, 265.