## ALLEN v. UNITED STATES.
### No. 11132.

United States Court of Appeals
District of Columbia Circuit.

Argued March 10, 1952.

Decided July 18, 1952.

Writ of Certiorari Denied Oct. 27, 1952.
See 73 S.Ct. 112.

Kenneth D. Wood, Washington, D. C., with whom Robert I. Miller, Washington, D. C., was on the brief, for appellant.

Joseph F. Goetten, Asst. U. S. Atty., Washington, D. C., with whom Charles M. Irelan, U. S. Atty., John C. Conliff Jr., and Joseph M. Howard, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee. George Morris Fay, U. S. Atty., Washington, D. C., when the record was filed also entered an appearance for appellee.

Before WILBUR K. MILLER, PROCTOR and BAZELON, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

A jury in the United States District Court for the District of Columbia found Albert Allen and Frank Proctor guilty of killing another while perpetrating a robbery, which is murder in the first degree.[1] We are concerned only with Albert Allen, who appeals from the death sentence imposed upon him.

The murdered man was George Schomber, known to his fellow employees at the Uline Ice Company as "Oatmeal." At 5:30 p. m. on Saturday, December 30, 1950, the superintendent sent Schomber on his last trip of the day as the driver of a special delivery truck. Less than an hour later he was found in the Uline garage, slumped behind the steering wheel of his truck. He was bleeding profusely from a wound between the eyes, and from his nose, ears and mouth. Blood was on his clothes, his face and hands. He died in a hospital at 1:20 a. m. the following morning, Sunday, December 31, 1950. Although Schomber had cashed his pay check for $53.61, which he had received at noon, and had collected

1. Section 22-2401, D.C.Code 1940.

more than $70.00 from customers, the police found on his person only an empty pay envelope, a delivery book and a few cents in change.

The appel'ant, Albert Allen, was employed by the Uline Ice Company as a truck driver and ice cube cutter. He finished work at noon on Saturday, December 30, 1950, and at about 5:30 p. m. was at the corner of 9th and O Streets, N. W., with Frank Proctor, his friend and later his co-defendant. They went in a cab to a delicatessen across the street from the Uline garage and then fell in company with George Boddie, another Uline employee. At a nearby liquor store Boddie bought whiskey, which the three consumed in an alley.

Soon after, Allen and Proctor entered the garage and awaited the return of Oatmeal, who, as a C.O.D. driver, would be apt to have money on his person. They prepared for him by breaking the handle of a push broom, thus obtaining an adequate weapon. When Oatmeal came in, probably about 6:00 p. m., the club was used with fatal effect. Taking the victim's wallet, they left the scene, divided the money, and threw the wallet in a sewer at 3rd and M Streets, N. E., from which it was later recovered by the police.

Sunday morning, December 31, 1950, Allen went to work at the usual time and soon learned that Oatmeal was dead. He saw two police officers in conversation with his foreman, and was later told by the latter the management had been instructed to notify the police of any employees who were absent from work.

On Monday, January 1, 1951, Al'en again went to work as usual. About 11:00 a. m. he drove his truck to 9th and O Streets, where he had a talk with Proctor and told him of Oatmeal's death. They had a second conversation at the same corner that same evening after Allen had finished work.[2]

2. Allen's version of these conversations, which he gave from the witness stand, follows:
"Q. Did you have any conversation with him at that time about this matter? A. No, I didn't. He asked me what happened over there. I told him somebody was killed and robbed. He say, 'Yes, did they question you about it?' I say, 'No, they ain't questioned me about it.' I went to make a couple of deliveries and I came back to the corner.
"Q. Oh, you were working at the time? A. Oh, yes, I was working.
"Q. I see. You went and made a few deliveries? A. That is right.
"Q. And you say you came back to Ninth and O Street? A. And I came back to Ninth and O.
"Q. Was Proctor there when you got back? A. He was.
"Q. Did you have a further conversation with him about this same matter? A. Then he asked me again, 'Have they questioned you?' And I say, 'Yes, man, they have questioned me.'
*      *      *      *      *
"Q. Had they questioned you? A. No, they didn't.
*      *      *      *      *
"Q. Did you have a conversation with him when you returned to Ninth and O after you had made some deliveries with respect to the Uline Company? A. I did. * * * He told me he wanted me to help him rob Henry Jackson. * * *

I told him he was crazy, and then he went on to tell me how smooth this job was going on.
"Q. Are you giving us, now, the exact words that he used, or did he clarify that by some other statement that you haven't told us? A. No, he says there weren't no danger. I said, 'You must be crazy.' He said, 'What you mean,' he says, 'You can get by with it, you know lightning don't strike twice in the same place.'
"Q. What, if anything, did you say to him? A. I say, 'I know it ain't going to strike in the same place by me.'
"Q. What else was said between you two at that time? A. Then he went on to tell me that he did this.
"Q. What did he tell you that he did? A. Told me he robbed this man.
"Q. What man are you speaking of? A. George Schomber, Oatmeal, as I call him.
"Q. Did anything precede his telling you that? A. Well, I didn't pay him too much mind. I thought he might have gotten it out of the paper, or something. I went on with my route. I didn't talk with him no longer until that night.
*      *      *      *      *
"Q. All right. Tell us what he said to you, and what you said to him. A. He asked me what did I think about the job. I said, 'What job?' He said, 'The one I was telling you I want you to do for me.' I said, 'You don't want me to

Alarmed because Proctor, who struck the fatal blows, was not disposed to suffer the consequences alone, Allen decided to protect himself by talking to the police and throwing all the blame on his friend. To that end he deliberately stayed away from work the next morning—Tuesday, January 2—in the hope the police would come to his house to interrogate him, as his foreman had told him they would do. He waited until 9:30 a. m., but the officers did not come. Then he went to 9th and O Streets, had another talk with Proctor,[3] and proceeded to the Uline plant, where he arrived

do anything for you.' Then he told me he did, and quite a few questions that I heard the officers around there that Sunday morning, that they didn't understand.

"Q. Did he say anything to you that Monday morning about Mr. Schomber? A. He told me he robbed a guy. He didn't call no names.

"Q. Then he talked to you also at that time about another man? A. That is right.

"Q. All right. Was there any further conversation? A. Not until I got off from work.

\* \* \* \* \*

"Q. Was Mr. Schomber discussed in that conversation? A. He was.

"Q. Will you tell us what occurred at that time? A. I asked him about it, and he insisted that he was the man that did it. And I asked him what did he hit the man with. He told me a stick. I say, 'You sure you hit the man with a stick, or an iron?' He say, 'A stick.' I say, 'Where did you get the stick from?' He told me he got it out of the back of the Uline garage.

"I said, 'How did you hit the man, man?' He said he hit him one time. I said the man had been hit more than one time. He said he hit the man a couple of times and he kicked him a couple of times. I said, 'It took all that to get a pocketbook out of the man's pocket?' He said he kicked him a couple of times after he got the pocketbook, then he kicked him twice.

"Q. Is that all you recall about the conversation concerning Schomber? A. I asked him how did he go about it? He told me he went around to the back way, and he couldn't get in the back way. I said, 'Why did you go around to the back way? How did you know to go there?' He told me he followed a coupe car in there. He said, 'I went in there behind the car, and after I couldn't get in the back, I come out between the alley of the filling station, and the building, and come around and went to the front.' I say, 'Yes.' I left him.

\* \* \* \* \* \* \*

"Q. Now, on Monday night, after you say Proctor related to you the details of this, did he say anything to you about

what would happen if you told anybody about it? A. He did tell me that.

"Q. Was that on Monday night? A. That was on Monday night.

"Q. All right. Tell us what that conversation was. A. He told me, he says, 'If you say—I ain't worried about you telling anybody nothing about I told you this.' I asked him why. I said, 'Why you so sure I ain't going to tell nobody?' He said, 'You was on the corner with me.' I say, 'Yes.' He says, 'I see you knew the boys you drank with, but they don't know me.' I said, 'I guess you are right.' I said, 'You don't worry about me saying nothing to nobody about it, but just the same, if I have to testify about it, I am going to tell about it.' I said, 'If they ask me who was on the corner with me, I am going to tell them it was Proctor and me.' And he said, 'You are going to jail if I go.' I say, 'All right, we go, but I ain't going to tell no lies, if they ask me about it.'

"Q. That was all of Monday's conversation? A. That was Monday's conversation."

3. This is Allen's version of the Tuesday morning conversation:

"Q. What did you say to him and what did he say to you? A. I asked Proctor where did he put the pocketbook, and what was in the pocketbook. He asked me why I wanted to know that. I said, 'You say you are going to take me to jail. I should know something.' He said, 'You intend to tell it?' I said, 'No, I ain't going to tell it. I just want to know it in case something does happen.' He described to me where he put it, at Ninth and M Streets. I told him, I says, 'There are four corners on Ninth and M.' He says, 'I put it right straight across from M Street, from the corner I was on, which would be on the corner across over in front of the liquor store.'

"Q. Did he tell you with respect to the pocketbook what it had in it? A. Yes.

"Q. What did he say it had in it? A. I stated to him, 'Man, you ain't robbed nobody.' He went on and told me what was in it, and I knowed the picture of this man that I knew he had in his pocketbook.

a few minutes after 10:00 a. m. Several police officers were there systematically interviewing the Uline employees, a task they had begun on Monday afternoon.

Although he had not been called, Allen awaited his turn and was admitted about noon. He told several untruths as to his whereabouts Saturday night, and, as he put it, "I told him some things I had done that I hadn't done, and I didn't have enough time to do them." Apparently he was not quite ready to accuse Proctor. Later, probably about 3:00 p. m., Allen went to headquarters with two officers, making two stops on the way to pick up the shoes and clothing he had worn the previous Saturday. In a test made in his presence, a police chemist found bloodstains on his coat. Allen explained by saying his girl friend struck him and caused his nose to bleed. At 4:00 p. m. Allen told Sergeant Furr he was in the Uline garage Saturday evening, saw the assault on Oatmeal, and could lead him to the guilty man. They drove to 9th and O Streets where he pointed out Proctor, who was immediately taken to headquarters.

Beginning at about 7:30 p. m. Allen made a full and detailed confession. When it had been reduced to writing and read back to him, he indicated one correction, which was made by the typist and initialed by him, after which he signed the document. Later he repeated his confession to certain Uline employees who had been called. We reproduce here a small portion of the written confession, which is enough to show in broad outline how he said the crime was committed:

"I have been knowing Frank Proctor for about a year by seeing him on the corner of 9th & O Streets, N. W. and drinking together. On the Saturday before last, that was on December 23rd, I met Frank at 9th & O Sts., N. W., and he asked me did I know where he could get some money and I told him yes and I gave him the address of the Uline Ice Company. I told him

"Q. Did he tell you at any time how much money he had gotten out of the pocketbook, if any? A. He told me it was $43.75.
"Q. Is that the total amount he said

to come over about 5:30 P.M. and I would be there, but he didn't come over. I saw him several times after that but he didn't say anything about it.

"Then on Saturday, December 30th, I saw him again on the corner of 9th & O Sts., N. W. about 5:00 P.M. and he wanted to know if the job was still good. I told him yes. We walked on down 9th Street to 9th & N. We went in the whiskey store and bought a half pint. We came out and caught a cab. We goes over to 3rd & L, N. E. We gets out of the cab and walks up to 3rd & M and then we came back to 3rd & L. On the way back we saw George Schomber, who we call 'Oatmeal' loading a truck. I told Frank there was Oatmeal loading a truck now.

"We walks on in front of the garage and Dorsey and Holmes was going in the garage in their trucks. George Boddie he jumped off of Holmes' truck and yelled for me to wait. I waited for Boddie and he comes on down the street. We goes to the whiskey store at 3rd & K. George Boddie buys a half pint and we goes in the alley and drink it. * * *

"Then we saw Ben, who is the janitor at Ulines, pull into the garage with the Coupe. Then Ben left out of the garage and went into the office, and then me and Frank went into the garage through the small door. We went back there in the back on the left hand side, where the trash barrels are kept, and Frank picks up a broom that was sitting beside the trash cans. It was a push broom with wooden handle. Frank picks up the broom and takes the handle out of it and tells me to stand up on the handle and break it in two. He held the handle and I stepped on it and broke it. Then he lays the handle down and says 'It's too light.' Then he picks up the broom and holds it until Oatmeal comes in.

he got from Schomber, or was that just in the pocketbook, if you know? A. That is what he said he got. I don't know—."

"Oatmeal pulls up to the gate and raised the gate on the garage and he came in with his truck. He parks his truck and gets out with a newspaper and a lunch box in his hand. Frank walks around behind him and hit him over the head twice. Then he drug him around the right hand side of his truck, looks in his pocket and gets his billfold and kicks him in the face twice. Then I let the door down and we went out."

Proctor also confessed soon after arriving at headquarters. Both were then taken to the Uline garage where they re-enacted the crime in the presence of police and other witnesses. There was some dispute between them as to whether Allen had struck Oatmeal. On Wednesday, January 3, after a hearing, the coroner held Allen to await grand jury action. This was equivalent to a hearing before a committing magistrate.[4] The next day, Allen confessed again, according to the Superintendent of Classification at the District Jail, who testified that in a conversation on Thursday, January 4, Albert Allen told him Frank Proctor had asked him about a week before the murder where he could get some money and that he told Proctor that Oatmeal was the only C.O.D. driver at Uline's; that on Saturday, December 30, he and Proctor went to the garage and, when Oatmeal came in, Proctor hit him twice with a push broom handle, took his money, and kicked him twice on the head.

Testifying in his own behalf, Allen did not categorically deny that he had planned the crime, that he was present in the garage aiding in the assault and robbery, and that he and Proctor divided the money. He was content to say what he had told the police was untrue. He did not deny making the admission to the jail official on Wednesday January 4.

This is an unusual confession case in that the appellant did not testify that his confession was elicited by physical or psychological torture or by any sort of pressure. Nor did he testify that he was caused to admit his guilt by the fact that he was in the presence of the police or was being detained by them. To the contrary, he said from the witness stand the officers treated him "fine" and "with great respect." He insisted many times that he was not mistreated in any way during the interviews with the police.[5] that he voluntarily went to them in the first place, and then went with them to headquarters and voluntarily gave them information. He "decided" to point out Proctor as the murderer.

Allen asks us to reverse his conviction on the theory that his confession was inadmissible because it came after he had been illegally detained by the police from noon until 7:30 p. m. without being taken before a committing magistrate. He did not state from the witness stand, nor does he now assert, that his admissions were induced by the fact he was in custody. He simply says that under the McNabb ruling [6] a con-

4. Section 11–1205, D.C.Code 1940; Neely v. United States, 79 U.S.App.D.C. 177, 144 F.2d 519, certiorari denied, 1944, 323 U.S. 754, 65 S.Ct. 83, 89 L.Ed. 604.

5. The following is typical of several statements to the same effect:

"Mr. Miller [Allen's counsel]: May it please Your Honor, we have contended from the beginning and now contend that he didn't threaten him and didn't abuse him.

"The Court: All right.

"By Mr. Bacon [government counsel]: Q. Did any other officer make any threats to you, or promises? A. No.

"Q. Or intimidate you in any way? A. No. One of them told me that if I knew anything about it I must tell because I would have a chance to explain my innocence.

"Q. And does that cover the period from 12 o'clock, when they first talked to you, until you went up to 9th and O, that no one intimidated you? A. That's right; no one did.

"The Court: Did anyone at any time, any police officer, intimidate you or threaten you or strike you?

"The Witness: No, sir, they did not.

"The Court: At no time.

"The Witness: At no time at all.

"By Mr. Bacon: Q. Was there any pressure exerted on you at any time? A. No pressure.

"Q. Of any kind? A. Not of any kind."

6. McNabb v. United States, 1943, 318 U. S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

fession is inadmissible if made during unnecessary delay in taking the prisoner before a committing official, and that this is true regardless of whether the prisoner's detention had the psychological effect of causing him to confess.

█ For the reasons stated in Pierce v. ┬┬. ' S'n*es, 91 U.S.App.D.C. 19, 197 F.2d 189, we think the McNabb rule, as amplified in Upshaw v. United States, 1948, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100, and other decisions, is that illegal detention before presentment to a committing magistrate, standing alone and without more, does not invalidate a confession made during its continuance, unless the detention produced the disclosure. So we cannot accept Allen's contention that his illegal detention—if it was illegal—invalidated his confession regardless of whether it produced it. The question then becomes (assuming for the discussion, without deciding, that he was unlawfully detained) whether his illegal detention must be presumed to have been coercion which caused him to confess, even though he did not attribute to it that coercive effect.

█ There may be circumstances in which the court should, without proof, conclude a prisoner's confession was the fruit of unlawful detention and therefore should not be received in evidence. But the presumption that the prisoner's detention elicited the confession should not be indulged when, as in this case, the defendant's testimony describes a quite different motive which caused him to tell his story to the police. Allen's account of his three conversations with Proctor on Monday and Tuesday shows his reason for confessing: he was attempting to forestall an accusation by Proctor that he had committed murder. That such was his purpose, formed after the first two conversations with Proctor on Monday, is demonstrated, not only by the substance of those conversations, but also by his behavior on Tuesday morning when he absented himself from work to invite questioning by the police; and when, after a third and final conversation with Proctor, he went immediately and uninvited to the Uline office to talk about the crime.

█ It is therefore our view, not only that Allen disclaimed unlawful detention or any other sort of pressure as the motivation of his confession, but also that he stated the real motive which prompted it,—a motive unrelated to the fact that he was in custody. Consequently, we think the confession, which was not otherwise attacked, was admissible.

█ Another ground for reversal relied on by the appellant is the denial of his motion for a severance. On the second day of the trial, although before any evidence had been introduced, both defendants asked a severance on the ground that their defenses were inconsistent, without pointing out to the court where the inconsistency lay. "It is the general rule that persons jointly indicted should be tried together, and granting separate trials is a matter of discretion." Hall v. United States, 83 U.S.App.D.C. 166, 168, 168 F.2d 161, 163, 4 A.L.R.2d 1193, certiorari denied, 1948, 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775. In Dauer v. United States, 10 Cir., 1951, 189 F.2d 343, 344, certiorari denied, 342 U.S. 898, 72 S.Ct. 232, it was said:

"* * * The mere fact that there is hostility between defendants or that one may try to save himself at the expense of another is in itself alone not sufficient grounds to require separate trials. It is only when the situation is such that the exercise of common sense and sound judicial judgment should lead one to conclude that one defendant cannot have a fair trial, as that term is understood in law, that a severance should be granted."

The District Court did not abuse its discretion in refusing to grant a severance. Nor was discretion abused in denying Allen's motion for a new trial.

The appellant also says the court erred in permitting the District Jail official to testify concerning Allen's admission of guilt made to him on January 4. This was plainly competent.

We have considered carefully each point advanced by the appellant and in addition we have studied the entire record to see if prejudicial error occurred which was not pointed out by the appellant. We found

none. The district judge conducted the trial in a m̶ painstaking way and exhibited throu̶out a meticulous concern for the right̶ of appellant.

Affirmed.

BAZELON, C̶ ̶t Judge (concurring specially).

Under the circumstances of this case, I do not think it can be said that there was "unnecessary delay" in taking the accused before a committing magistrate within the meaning of Rule 5(a) of the Federal Rules of Criminal Procedure. Cf. concurring opinion, Pierce v. United States, 1952, 91 U.S.App.D.C. 19, 197 F.2d 189; United States v. Mitchell, 1944, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140; United States v. Leviton, 2 Cir., 1951, 193 F.2d 848; Haines v. United States, 9 Cir., 1951, 188 F.2d 546, certiorari denied, 1951, 342 U.S. 888, 72 S.Ct. 172. Hence I do not join in a consideration of the court's ruling " * * * that illegal detention before presentment to a committing magistrate, standing alone and without more, does not invalidate a confession made during its continuance, unless the detention produced the disclosure." [1] In all other respects I concur in the court's opinion.

1. Majority opinion, 91 U.S.App.D.C. 202, 202 F.2d 334.