The **UNITED STATES** of America,
Plaintiff-Appellee,

v.

**Julius L. ECHELES,** Defendant-
Appellant.

The **UNITED STATES** of America,
Plaintiff-Appellee,

v.

**Paul ECHELES,** Defendant-Appellant.
Nos. 11185, 11186.

United States Court of Appeals
Seventh Circuit.

April 20, 1955.

Rehearing Denied May 10, 1955.

Major, Circuit Judge, dissented.

148

Frank W. Oliver, Francis Heisler, Chicago, Ill., for appellant.

Robert Tieken, U. S. Atty., Anna R. Lavin, Asst. U. S. Atty., Chicago, Ill., for appellee. John Peter Lulinski, Anna R. Lavin, Edward J. Calihan, Jr., Asst. U. S. Attys., Chicago, Ill., of counsel.

Before DUFFY, Chief Judge, and MAJOR and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

From judgments of conviction upon the verdicts of a jury, defendants, Julius L. Echeles ("Julius") and Paul Echeles ("Paul"), have appealed.

The indictment consisted of 13 counts. Eight of the first nine counts charged they received, and one count that they solicited, money in consideration for a promise of support and the use of influence in obtaining for the payers appointments to various positions in the post office, being misdemeanors in violation of 18 U.S.C.A. § 215. Counts 10 to 12 charge the defendants promised money to John Haderlein, postmaster of Chicago, to influence his decision in official matters, being felonies in violation of 18 U.S.C.A. § 201. Count 13 charges Paul and Julius and defendant, Max Lewis, with conspiracy to commit all the offenses set forth in counts 1 through 12 in violation of 18 U.S.C.A. § 371. The

jury returned a verdict of not guilty as to Lewis on count 13 and found Paul and Julius guilty on all 13 counts.

1. Defendants in this court say that the court's prejudicial rulings and conduct deprived defendants of a fair trial according to due process of law.

(a) They say that the trial judge abdicated his judicial function to the prosecutor. In support of this contention they point to the following proceedings: (1) When, prior to the trial, defendants attempted to procure by *subpoena duces tecum* certain witness statements, the court struck from the subpoena reference to a statement by one John Haderlein. Defendants now say, in doing so the judge reversed himself following a suggestion by Mr. Cohen, the government counsel. We find nothing in the proceedings on that occasion to sustain this charge. (2) Later government counsel moved to quash a subpoena procured by defendants and served upon the postmaster, claiming that it called for a huge mass of documents which obviously had no materiality. Defense counsel stated that they certainly should have the personnel jackets of the individuals named in the indictment. To this the court responded, "How about those, Mr. Cohen?" The court did not merely suggest that the defense "consult with Mr. Cohen," as they now say in their brief. The court added to the suggestion, "Perhaps he can get for you what you really want. After all, you do not want him to bring a carload of personnel jackets in here." But defense counsel rejoined, "Yes, I do, your Honor." The court then sustained the motion to quash the subpoena. (3) At the trial, when Finn, attorney for defendant Lewis, stated an objection to certain government exhibits, the court asked Cohen if he cared to comment on that objection. The latter stated that he had no objection to their not being admissible against Lewis at that time. Whereupon the court told the jury that "We are going to receive these exhibits at this time only as to the defendants Paul Echeles and Julius L.

Echeles. They are not to be considered as evidence against the defendant Max Lewis at this time. I will sustain your objection at this time so far as your client is concerned, Mr. Finn. I am sorry I didn't ask you to state your position." Mr. Stewart, attorney for Paul and Julius, said, "I had forgotten he is here, your Honor. I beg his pardon." (4) When the question of subpoenas came up again, the court observed that Mr. Cohen was to consider them overnight and inquired: "Did you consider them?" Receiving an affirmative answer, the court asked, "Would you care to state the Government's position with respect to these subpoenas?" Thereupon followed a statement by Mr. Cohen of the government's objections to the production of the material asked for by the subpoenas.

Seventeen other colloquies, of a similar nature, are also cited to show abdication. This contention, given prominence by defendants as the first point argued in their brief in this court, is without basis in fact.

(b) Defendants urge that the court repeatedly and improperly limited their cross-examination. We have examined the incidents at the trial specifically relied upon by the defendants in this connection.

As we said in United States v. Lawinski, 7 Cir., 195 F.2d 1, at page 7, where this court discussed the scope of cross-examination:

"It is for the presiding judge to exercise a wise discretion in determining whether, considering the examination in chief, it is fit and proper that the questions presented be permitted or excluded. Storm v. United States, 94 U.S. 76, 24 L.Ed. 42. All the decisions agree that the latitude allowed should be great enough to subserve ends of justice; but once fixed by the trial court it can not be deemed erroneous except where it is clear that that discretion has been abused, even though the discretion is necessarily vague in extent."

We do not believe that the court abused its discretion in respect to the scope of cross-examination allowed defendants' counsel.

■ (c) It is argued that the trial judge embarked on a deliberate campaign of ridiculing trial counsel in the eyes of the jury. Typical of the examples cited are the following: When defense counsel Stewart was cross-examining the first government witness, the district attorney objected and the court sustained the objection saying: "Mr. Stewart, if there is some part of the case that makes it necessary for that information to go to the jury, there is a way of getting it in. We are restricted by the rules of evidence as to what you may inquire into on cross-examination." Mr. Stewart: "Am I to understand Your Honor is going to allow them to prove what they want to and I cannot ask anything about these records?" Later, the court said to Mr. Stewart: "There is a way to prove anything material to your case, but that is not the right way, in my opinion." Again the court said to him: "If it is important to your case, then there is a way to get it in. We cannot do everything with one witness." The court also said: "I do request of you, Mr. Stewart, that you ask questions that are designed to impeach * * * just conform to the rules of evidence."

In view of the colloquy between court and counsel which appears to have accompanied these and other similar instances cited by defendants, we believe that the remarks of the court were not intended to, and did not, have the effect of ridiculing defense counsel.

■ A fair appraisement of the record fails to show that anything which the trial judge did or said deprived defendants of a fair trial.

2. Defendants also argue that the district attorney (Mr. Cohen) violated defendants' right to a fair trial because of his illegal and prejudicial conduct and questions during the trial. They point out that, the court having delegated its judicial function to the prosecution attorney, it was therefore error for the prosecutor to take advantage of that situation. We need not consider this argument in view of our holding that there was no such abdication.

■ We will, however, consider what defense counsel cites as the "highest peak" reached in the prejudicial conduct of the district attorney. He was cross-examining postmaster Haderlein, a defense witness. Without objection from defense counsel, Mr. Cohen asked: "For your information, Mr. Haderlein, the post office inspectors have testified that Paul Echeles told them, in addition to what is in the statement, that you were the person mentioned as the appointing official. Now, does that change your opinion of Paul Echeles?" The witness answered, "Either it would change my opinion of him or of the inspectors." Mr. Cohen then asked that the answer be stricken as not responsive to the question. The court said: "It may go out, and the jury will disregard it."

Obviously, the question called for a yes or no answer and the answer was unresponsive. Inasmuch as no objection was made to the question, and the court properly struck the answer and told the jury to disregard it, we find that the incident involved no prejudicial conduct on the part of the prosecutor.

We similarly characterize the other instances of alleged misconduct.

3. Julius, before the trial, moved for a severance and supported his motion by his own affidavit, which set forth that he was informed that Lewis made a statement to the federal officers and also testified before the grand jury, that Paul made and signed a statement and Julius was informed that Paul "expects" to claim on the trial that the statement was involuntary. He also stated that he (Julius) was not present when the above statements were made and that "they are not admissible as evidence against him," having been informed that said statements purport to relate to transactions in which Julius had been mentioned. He also stated that he "fears and represents.

his belief that any such statement introduced in evidence as against said co-defendants in a joint trial would prejudice the rights of this affiant to a fair and impartial trial." The motion was denied.

While defense counsel admits that the granting of a severance rests within the discretion of the trial court, he maintains that in this case the court abused its discretion. He does not point out what showing was made by the affidavit accompanying the motion upon which such charge of abuse of discretion is based. Actually there is no allegation in the affidavit as to the contents of the statements signed by the co-defendants nor is there any allegation that their defenses would be antagonistic to the defense of Julius.

Julius then shifts to a later occasion preceding the trial, when there was a discussion before the court as to who the attorneys for the various defendants were. It appearing that Mr. Finn would try the case for the defendant Lewis, and that Mr. Stewart and Mr. Oliver would represent both Paul and Julius, the district attorney stated that "There may well be situations developing where there will be a genuine conflict of interest between those of Julius L. Echeles and Paul Echeles." However, Mr. Stewart and Mr. Oliver, after a lengthy colloquy with the court and counsel, persisted in stating that they would represent both Paul and Julius. The court thereupon called these two defendants into chambers and stated what had just occurred. When Julius started to answer, Mr. Stewart silenced him. During the colloquy the court repeatedly asked Mr. Stewart if there was anything he would like to say or any comment he wished to make. Mr. Stewart asked whether it called for comment and added that he did not hear any motion. It is clear that neither he nor any attorney representing Julius made any motion on that occasion for a severance. The case thereafter went to trial as to all three defendants. Mr. Stewart and Mr. Oliver did try the case for both said defendants.

Inasmuch as Julius and Paul, and their lawyers, were advised of the possibility of conflict of interest between them at the trial and they nevertheless then chose to proceed with common counsel, one of whom still represents them in this court, and inasmuch as they made no motion for severance when this possible conflict of interest was called to their attention before the start of the trial, we do not believe that the charge of abuse of discretion by the trial court in this respect is supported by the record.

At the close of the government's case, Mr. Stewart renewed the motion for severance which was made originally and denied. It was denied.

In Allen v. United States, 91 U.S.App. D.C. 197, 202 F.2d 329, where a motion by each of two defendants for a severance was made on the second day of the trial, although before any evidence had been introduced, on the ground that their defenses were inconsistent, without pointing out to the court where the inconsistency lay, it was held that a denial of the motion did not constitute an abuse of discretion. The court, 202 F.2d at page 334, quoted from Dauer v. United States, 10 Cir., 189 F.2d 343, at page 344:

"'* * * The mere fact that there is hostility between defendants or that one may try to save himself at the expense of another is in itself alone not sufficient grounds to require separate trials. It is only when the situation is such that the exercise of common sense and sound judicial judgment should lead one to conclude that one defendant cannot have a fair trial, as that term is understood in law, that a severance should be granted.'"

Defense counsel argues that the jury was confused when evidence was submitted against one defendant, in keeping in mind the exclusion of the defendants as to whom it was not admitted. The record, on the other hand, indicates an intelligent understanding by the jury of the applicability of such evidence. For instance, the jury found the defendant

Lewis not guilty, although it found the other defendants guilty. Moreover, it is highly significant that the record of the trial is devoid of any indication of antagonism between Julius and either of his co-defendants.

On the record before us we cannot say that error was committed by the trial court in originally denying Julius' motion for severance or in later denying the motion of the respective defendants for a severance.

4. Defendants contend that they were deprived of their constitutional right to compulsory process. They refer to the court's quashing of several *subpoenas duces tecum* which would have required the government to produce for their inspection certain documents supposed to be in the government's possession. This contention is based upon the sixth amendment to the constitution of the United States which requires:

"In all criminal prosecutions, the accused shall enjoy the right * * to have compulsory process for obtaining Witnesses in his favor * * *."

and also upon rule 17(c) of the federal rules of criminal procedure, 18 U.S.C.A., which provides:

*"For Production of Documentary Evidence and of Objects.* A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. * * *"

■■ (a) The first document sought was a statement by postmaster Haderlein. When the motion was argued, the district attorney told the court that Haderlein would not be called as a government witness. It may be that under rule 17(c) the subpoena process is available to a defendant to enable him to impeach a government witness by the use as evidence of a statement given by him to the government. Bowman Dairy Co. v. United States, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879. However, that is academic in this case because Haderlein did not testify as a government witness. He did testify as a defense witness. Under these circumstances the defense could not have introduced the statement in evidence. It therefore had no evidentiary value to the defense and any effort made by the defendants to obtain the evidence by subpoena could not have been in good faith. Bowman Dairy Co. v. United States, supra, 341 U.S. at page 219, 221, 71 S.Ct. 675. Rule 17(c) is a statutory method of implementation of the sixth amendment. Defendants not having brought themselves within the purview of rule 17(c), no error was committed by the district court in quashing the subpoena insofar as it pertained to Haderlein's statement.

■ (b) The second subpoena required production of the postal personnel jackets of all postal employees recommended for promotion during the tenure of Haderlein as postmaster, together with all documents and letters referred to therein or relating thereto. At the time the court quashed this subpoena, he stated, "After all, you do not want him (district attorney) to bring a carload of personnel jackets in here", to which defense counsel replied, "Yes, I do, your Honor." This remark indicates that the scope of the subpoena was unreasonable and oppressive within the meaning of rule 17(c), and the court did not abuse its discretion in quashing it.

■ (c) The third subpoena required production of the personnel jackets of the accomplice witnesses who testified against the defendants. When the defense moved for production of these documents, the court deferred ruling on the motion at the specific request of their chief counsel. Later in the trial, upon renewal of defendants' motion for production, the court permitted the subpoena to be filed and ordered the documents produced. Defendants are in no position to now urge as error the precise action of the court which defense counsel requested.

(d) The fourth subpoena required production of the "political personnel files" maintained by Haderlein during his tenure as postmaster, further identified by the names of six persons who testified for the government, and one Harold R. Noftz, deceased, who is named in the indictment as having paid money to influence his promotion. In the colloquy of counsel and court which preceded the quashing of this subpoena, the district attorney stated that the government had no "political personnel files", although there were personnel files of a confidential nature.

He contended that there was no showing as to the materiality of the documents sought. Defense counsel indicated to the court that the purpose of the subpoena was to reach letters which men in public office might have written to the postmaster about the qualifications, or lack of qualifications, of aspirants for positions. We do not believe that such letters would be material in this case, because the indictment relates to payments of money and promises to make such payments, in consideration of promises of support and influence in obtaining such appointments. The existence of letters from public officials to the postmaster would have no tendency to prove or disprove such charges in the indictment. The quashing of the fourth subpoena was therefore not error.

5. On one occasion during the trial Mr. Stewart, who had been acting as chief counsel for Julius and Paul, was missing from the courtroom.

Thereupon Mr. Oliver, the other attorney for said defendants, stated to the court "We have run out of witnesses at this time" and asked for a short recess. The court asked him if he had no other witnesses in court ready to go ahead, and Mr. Oliver said that that was correct. The court asked how long it would take to get a witness, and Mr. Oliver stated that he did not know where Mr. Stewart was at that time or what he had in mind. The court stated that Mr. Stewart had not told him why he was leaving.

The court then asked Mr. Oliver several questions in regard to whether there was a witness in the courtroom who could testify. Mr. Oliver's answers were evasive. The court then denied a motion for an adjournment and told Mr. Oliver to put a witness on. Mr. Oliver stated "I'll see if I can find one *in the witness room.* There may be one or two there." On request, the court gave Mr. Oliver a few minutes adjournment for the purpose of telephoning Mr. Stewart.

The colloquy accompanying these proceedings is said by defense counsel to delineate the "intense prejudice of the judge and his intent to do the defendants harm."

The unexplained disappearance of chief defense counsel Stewart during the trial, without notice to or leave of the court, followed by the exasperating sparring of Mr. Oliver when the court attempted to find whether any witness was in court to testify, in our opinion, falls very short of showing prejudice on the part of the judge. Courts have repeatedly held that the granting of a continuance during a trial is purely a matter of discretion and not subject to review by upper courts, unless the discretion be abused. United States v. Vrilium Products Co., 185 F.2d 3, at page 5; United States v. Glasser, 7 Cir., 116 F.2d 690, 701; United States v. Hartenfeld, 7 Cir., 113 F.2d 359, 362, certiorari denied 311 U.S. 647, 61 S.Ct. 30, 85 L.Ed. 413; U. S. v. Cook, 7 Cir., 184 F.2d 642, 643.

We hold that the refusal to grant a continuance under the circumstances above outlined was not an abuse of discretion and does not constitute error.

6. The court, over objection, admitted into evidence a confession signed by Paul in an office in the main post office building in Chicago. The court, before doing so, heard only the testimony of a government witness, inspector Vernon K. Peterman, both on direct and cross examination. At that time the defense offered no evidence as to the ad-

missibility of the document. While defense counsel indicated at that time that he might later make a motion to strike the document, he failed to do so. We hold that, on the evidence heard by the court, its admission of the confession in evidence was not erroneous.

Thereafter, before the court and jury, evidence was taken as to the confession. The facts most favorable to Paul, brought out thereby, we now state. To what extent the inferences favorable to Paul, deducible from these facts, were contradicted by other facts appearing in evidence, we need not now discuss.

Inspector Raphael A. Smith testified that Paul signed the confession in his presence, and that he participated in the questioning of Paul with inspector Peterman.

It is undisputed that Paul was a postal clerk and that he also had an insurance business conducted from an office of his own.

On the occasion in question Smith telephoned Paul at his insurance office, about noon on May 6, 1952, and asked him to come over. Paul got there about noon and he and inspector Peterman questioned Paul for about eight hours. Smith knew he was a postal clerk. Smith told him that they were investigating the manner of promotions in the post office. They talked about it and asked him questions. For a couple of hours he denied "handling money." Smith told him that they had "the information." He also told Paul that they held statements to that effect from various people. They confronted him with Max Lewis' statement involving Paul and said that they might have others.

During the questioning Smith called up Paul's office and talked to his office girl. This employee, Miriam T. Collins, testified that this call was near 4:30 o'clock. She said that Smith said he was calling for Paul. She told him that Paul was not there but that he would be in at 4:30. Smith said that he didn't think he (Paul) would be there. She said that she thought he would be because he had an appointment.

Paul asked Smith if he could call his wife, because she would be expecting him home and he didn't want her to worry about him—that she would have dinner ready. Smith consented but told Paul not to tell her he was talking to the inspectors—just to tell her he was at the post office and he would be late getting home. Smith did not want him to get into a long discussion about what he was doing. Thereupon Paul called his wife. She testified that it was then about 7:30 P.M. He talked to his wife, also his daughter. Smith had told Paul that if he did tell his wife any reason, Smith "would have to cut him off." According to Smith, Paul left them about 8 P.M. His wife testified that she did not hear from him between 7:30 in the evening when the call came and 11 o'clock that night when she next saw him.

Inspector Peterman also testified in the presence of the jury as to the taking of the confession from Paul.

When Paul's wife was testifying his counsel asked her to detail the conversation she had with Paul when he called her on the telephone. The court sustained an objection to the question.

 Paul's confession being in evidence, it became a question for the jury as to whether or not it was voluntarily given and, if so, it was for the jury to give it such weight as the jury thought it was entitled to receive. The voluntariness of the confession would have been a proper subject for argument by counsel before the jury. Whether or not defense counsel embraced that opportunity we do not know, because the record which they filed in this court fails to include the arguments of counsel for either side.

Paul's counsel requested the court to give the following instruction to the jury:

"The jury is instructed that threats, pressure or coercion used in obtaining statements, whether written or oral, may consist in depriving a person of food and water,

or depriving him of his liberty, or depriving him of his right to consult with counsel. If the jury find from the evidence that the statement of Paul Echeles was so obtained, then it shall not consider such statements for any purpose."

The court peremptorily refused to do so.

██ Whether it would have been error for the court to refuse this instruction if the evidence indicated that Paul was deprived of food and drink during the time he was in the inspectors' office, we are not called upon to decide. This is for the reason that evidence to that effect was adduced only in the absence of the jury and before the court, and was not by defendant's counsel re-introduced in the presence of the jury. Hence, the tendered instruction called the attention of the jury to evidence which was never heard by it. Its refusal was not error.

██ Also refused by the court was the following instruction tendered by the defense:

"The Court instructs the jury that if it finds from the evidence that the written and oral statements attributed to the defendant Paul Echeles were extracted from him involuntarily or by the use of threats, coercion, pressure or deceit in violation of his constitutional rights then the jury may not consider the said statements whether written or oral."

For several obvious reasons the action of the court was not erroneous. The mere reference to Paul's "constitutional rights", without defining them for the jury, was not adequate for such an instruction. Moreover the vague use of the word "deceit" is not sufficient in view of the context of this instruction. The use of the word "involuntarily" with the subjunctive "or" and the words "by the use of threats, coercion, pressure or deceit" would be likely to mislead the jury.

The district court properly followed the course prescribed by law in reference to the proffered confession of Paul. In Patterson v. U. S., 4 Cir., 183 F.2d 687, at page 689, that course is indicated:

"The general principles governing the admissibility of confessions are well established. The true test of admissibility in evidence is whether the confession was made freely, voluntarily and without compulsion or inducements of any sort. * * * This is a question relating to the admissibility of evidence and is not a question of fact for the jury, but on the contrary is the duty of the court alone to hear and decide upon the evidence offered. * * * And where the evidence is conflicting, as here, it is for the jury. * * * However, this does not mean that a jury shall pass on the admissibility of evidence, but merely that the jury may reject the evidence if it disagrees with the court's original determination that it was voluntarily made. * * * And the burden is on the prosecution to establish that the confession was not obtained by improper means. * * *"

██ The jury by its verdict indicated that the confession was not obtained by improper means.

7. Contending that a defendant may not be convicted upon his uncorroborated extra-judicial confession, defendants say that the government failed to present sufficient proof to corroborate the confession of Paul as to counts 1, 10, 11 and 12.

██ A conviction cannot rest upon a confession unless it is corroborated by evidence establishing the *corpus delicti*. To this effect, defendants' counsel cite Forte v. U. S., 68 App.D.C. 111, 94 F.2d 236, 127 A.L.R. 1120, and the government cites Manning v. U. S., 10 Cir., 215 F.2d 945.

 Most American courts take the view that the phrase *"corpus delicti"* includes first, the fact of an injury or a loss and secondly, the fact of somebody's criminality (in contrast *e. g.* to accident) as the cause of the injury or loss. The proof of these two elements involves the

commission of a crime by somebody. But the phrase *"corpus delicti"* does not include the fact of the connection of the accused with the crime—his identity as the criminal, or the guilty agent through whom the wrong has occurred. Manning v. U. S., 215 F.2d 945, at page 947.

In the Forte case, supra, the court, in speaking of the corroborating evidence of the *corpus delicti,* said 94 F.2d at page 240:

"We do not rule that such corroborating evidence must, independent of the confession, establish the *corpus delicti* beyond a reasonable doubt. It is sufficient, according to the authorities we follow, if, there being, independent of the confession, substantial evidence of the *corpus delicti* and the whole thereof, this evidence and the confession are together convincing beyond a reasonable doubt of the commission of the crime and of the defendant's connection therewith."

To the same effect, see U. S. v. Angel, 7 Cir., 201 F.2d 531, at page 533.

■■ The government attempts to meet the requirement for independent proof of the *corpus delicti* for the purpose of corroborating Paul's confession, by relying on his oral admissions made to the postal inspectors at the time they were obtaining from him the written signed confession. There are at least two reasons why the government is in error. First, the oral statements which he made and which then and there were incorporated by the inspectors in the written confession, cannot for this purpose be considered separately from the confession itself, and hence they are no part of the proof of the *corpus delicti.* Secondly, the law is that oral admissions cannot be considered against a defendant, any more than his written confession can be, unless they too are supported by independent proof of the *corpus delicti.* In Gulotta v. U. S., 8 Cir., 113 F.2d 683, at page 686, it is said:

"Indeed, there is no sound reason why an uncorroborated voluntary ad-mission of some element of crime should be given greater force as evidence of guilt than is accorded the accused's outright confession of the crime itself. * * * No authority has been found holding that admissions may be given greater weight as evidence than may be given confessions, or that admissions may be received and considered as independent evidence corroborating a confession. * * *"

■ Count 1 charges, in substance, that the defendants received $800 from Harold R. Noftz in consideration of a promise of support and the use of influence in obtaining an appointment for him in the post office. Up to the time the government rested its case in chief there was no proof corroborating Paul's confession in regard to Noftz. It was then that defense counsel moved the court for a directed verdict of acquittal. Hence the court erred in not directing a verdict as to count 1.

Neither was there, when said motion was made, any evidence in the record, independently of Paul's confession, that Paul or Julius promised to postmaster Haderlein payment of money with intent to influence the latter's decision in the matter of appointing Noftz to a position of clerk in charge of the post office at Chicago, as charged in count 10. Hence it was error for the court to refuse to direct a verdict of acquittal as to said defendants on said count.

As to count 11, which was in substantially the same form as count 10, and related to the appointment of Morris Lazik to the position of general foreman in the post office at Chicago, there was evidence tending to prove the following facts:

Lazik was an employee in the post office where Haderlein was the appointing official and had authority to recommend to the post office in Washington promotions in the Chicago post office, there being no evidence that any such recommendation was not followed. About Christmas, 1951, at the post office where Paul was employed, he volunteered to

held employee Lazik in securing a promotion and Paul told Lazik that to accomplish this result he would have to see his brother, Julius, whose office address he gave to Lazik. This Lazik did, being introduced to Julius by Paul. Paul having left the office, Julius told Lazik that the promotion would cost Lazik $750. Lazik asked if he could arrange payment with Paul, and Julius said any arrangement made with Paul would be satisfactory to him. Later the same month Lazik called on Paul in Paul's insurance office, paid Paul $400, signed a note for $350 and delivered it to Paul. In the previous month Julius had talked to Isadore Stern, another post office employee, after Paul had sent him to Julius about getting a promotion, at which time Julius said that such a promotion would cost $750. Julius said he "got only a small part of this money, the rest going to other parties", and that "it could be done through some north side politician" (without mentioning any name). Julius' language tended to indicate a customary method of handling such transactions.

At Julius' request Irving Fasman, his office associate, wrote a letter dated December 27, 1951, addressed to postmaster Haderlein, recommending Lazik for promotion to general foreman. Other than being introduced to Lazik in the office about the time he wrote the letter, Fasman had no further contact with Lazik. He did not know Haderlein. Later Fasman's letter was found in Lazik's personnel folder in the file in the post office.

Lester M. Barritt was director of personnel at the Chicago post office at the time in question. The procedure there followed in connection with promotion of employees to supervisory jobs was the receipt by him of a memorandum from Haderlein authorizing Barritt to submit recommendations to Washington for promotions indicated in the memorandum, and then a form providing for the promotion was transmitted to Washington. Such a recommended promotion to general foreman was executed for Lazik and transmitted January 18, 1952, to become effective February 1, 1952. Lazik became general foreman on February 1, 1952.

 This evidence, together with the reasonable inferences deducible therefrom, constituted independent proof of the *corpus delicti* under count 11, and therefore it was not error for the trial court to refuse to direct a verdict of not guilty on said count at the close of the government's case in chief.

As to count 12, which was in form similar to counts 10 and 11, except that it pertained to the appointment of Isadore Stern to the office and position of clerk in charge, it is true that there was evidence tending to prove the following facts: In the fall of 1951, Paul asked Stern if he would like to get a promotion; in November, 1951, Stern paid Julius $750 in Julius' office; on December 15th, 1951, he received notice that he would be promoted to clerk in charge, retroactive to December 1st; yet there is no evidence that a letter was written at Julius' direction, to Haderlein, as was done in the Lazik transaction, nor was any other contact shown between Julius and Haderlein in regard to Stern.

 This means that there is no evidence, other than Paul's confession, from which a person could reasonably conclude, directly or by inference, that the defendants promised money to postmaster Haderlein with intent to influence his decision as charged in count 12. For that reason we hold the *corpus delicti* under count 12 was not proved by evidence independently of the confession. Hence, the trial court should have directed an acquittal at the close of the government's case in chief.

8. Defendants contend that the evidence is insufficient to sustain the verdicts on the misdemeanor counts, being 1 through 9.

It is unnecessary for us to make further reference to count 1.

As to count 2, we have heretofore, in connection with count 11, summarized the evidence (other than Paul's confession) tending to support the charge con-

tained therein. Considering that confession against Paul but not against Julius, we hold that there is sufficient evidence in the record to support the jury's verdict as to both Paul and Julius under count 2.

■■■ As to count 3, we have heretofore, in connection with count 12, summarized the evidence (other than Paul's confession) tending to support the charge contained therein. Aside from that confession, we hold that there is sufficient evidence to support the jury's verdict as to both Paul and Julius under count 3. However, in connection with count 3, the defendants contend that, by their motion in arrest of judgment, they properly raised in the district court the point that the government had failed to prove venue as to count 3. The record shows, by the testimony of various witnesses as to that part of the transaction which occurred in the post office, that it is located in Chicago; and we will take judicial notice that Chicago is in the Northern District of Illinois. Part of the transaction referred to in count 3 took place in Julius' office. There is evidence that this office was located on Washington Street in the city of Chicago. Venue was proved.

As to counts 4 and 5, the sole argument made by the defendants is that government witness Morris Berman, while testifying under count 4, was not asked to and did not physically point to the two Echeles defendants as a means of identification. In the questions put to him they were both referred to by name, and he testified to his dealings with them, covering the matters involved in count 4. It is also urged that when government witness Ervin Boese was testifying as to the matters involved in count 5 there was a similar lack of physical identification of Julius. The record shows that defendants were on trial for many days, and under the same names as referred to in the testimony of Berman and Boese they were present and identified by numerous other witnesses. There is nothing to these contentions.

We have examined the evidence pertaining to counts 6 and 7. As to count 6 we find that there is sufficient evidence as to both Paul and Julius to support the verdict of guilty.

As to count 7 we find no evidence to support the guilty verdict as to Julius, but ample evidence to support the verdict of guilty as to Paul.

As to counts 8 and 9, in arguing that the evidence is insufficient to support the verdicts, defense counsel point merely to evidence going to the credibility of several government witnesses. The credibility of witnesses and the weight to be given their testimony, are matters for consideration of the jury, with which the court will not interfere. We will not disturb the convictions as to these counts.

9. Defendants urge a total lack of evidence to sustain the convictions on counts 10, 11 and 12. We have already held that independent evidence of the *corpus delicti* as to count 11 was sufficient to corroborate Paul's confession of guilt of the charge therein contained. Paul's participation in the crimes charged, and the details thereof, were set forth in this confession. We therefore conclude that the entire evidence pertaining to Paul was sufficient to sustain his conviction under count 11. We have heretofore set forth the facts appearing in evidence as to Morris Lazik's attempt to procure a promotion, aside from Paul's confession. This evidence is sufficient to sustain the conviction of Julius.

On the other hand, we have already held that independent evidence offered under counts 10 and 12 to prove the *corpus delicti* was insufficient to corroborate Paul's confession, and accordingly we now hold that the entire evidence pertaining to Paul was insufficient to support his conviction under those counts. Since Paul's confession was not admitted as against Julius and since, as heretofore stated, the other evidence was insufficient to prove the *corpus delicti* under counts 10 and 12, it is clear that Julius' conviction under those counts cannot stand.

10. Count 13 charges that Paul and Julius and Max Lewis did, from about

July 1, 1951 to May 6, 1952, conspire to "commit offenses against the United States, to-wit: the offenses set forth and described in the preceding counts in this indictment" (which are incorporated in count 13 by reference). It further charges that, to effect the objects of the said conspiracy, and for the purpose of carrying it into execution, they performed the acts charged in the preceding counts of the indictment, and also certain specific acts.

■ Defendants argue that this is a charge that the defendants conspired to commit *all the several offenses* charged in the first twelve counts, the first nine counts charging *misdemeanors*, and counts 10 to 12 inclusive charging *felonies*. They state that no rule permits joinder of separate offenses in a single count. We fail to see the pertinency of the last statement. Count 13 charges a single offense—a conspiracy. The jury found Julius and Paul guilty on all of the thirteen counts. Count 13 is not duplicitous as contended by them. The variance in the degree of punishment permissible for misdemeanors as distinguished from felonies is irrelevant. They rely on John Gund Brewing Co. v. United States, 8 Cir., 204 F. 17. However a later case, Frohwerk v. United States, 249 U.S. 204, at page 209, 39 S.Ct. 249, 252, 63 L.Ed. 561, holds:

"Countenance we believe has been given by some Courts to the notion that a single count in an indictment for conspiring to commit two offences is bad for duplicity. This court has given it none. * * * The conspiracy is the crime, and that is one, however diverse its objects."

This conspiracy prosecution is brought pursuant to 18 U.S.C.A. § 371.[1]

In Braverman v. United States, 317 U.S. 49, at page 54, 63 S.Ct. 99, at page 102, the court said:

"The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute, § 37 of the Criminal Code. For such a violation only the single penalty prescribed by the statute can be imposed."

Count 13 is not vulnerable to defendants' attack.

■ 11. By their motion to quash the indictment, defendants say that they raised, and now raise, the question as to whether a promotive office is an appointive office or place as contemplated in 18 U.S.C.A. § 215, which reads:

"Whoever solicits or receives, either as a political contribution, or for personal emolument, any money or thing of value in consideration of the promise of support or use of influence in obtaining for any person any appointive office or place under the United States, shall be fined not more than $1,000 or imprisoned not more than one year, or both."

The promotions involved in this case were made without examination. They were appointments of persons already in the postal service to offices or places more attractive than those held by them; they were therefore considered promotions. According to the established practice these promotions were made upon the recommendation of the postmaster at Chicago.

■ The phrase "appointive office" or "place" as contained in § 215 supra is, it seems to us, inclusive of the offices and positions to which promotions of various employees were made or sought, as re-

1. It reads:
"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
"If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

ferred to in the indictment and the evidence in this case. We so hold.

The district court therefore did not err in denying a motion to quash the indictment.

12. Defendants contend that the district court misled the jury with erroneous instructions and in refusing to give proper instructions:

(a) The jury was instructed:

"Now there has been some evidence introduced with reference to the reputation of the defendants in their own communities prior to their indictment. The circumstances may be such that an established reputation for good character may alone create a reasonable doubt, although without it the other evidence would be convincing.

"You should take the evidence of good reputation into consideration in determining the guilt or innocence of the several defendants, but the mere fact that the defendants, or any of them, may have had a good reputation prior to his or their indictment should not be used by you as an excuse to acquit him or them in this case, if you believe, beyond a reasonable doubt, from all the evidence in the case, including the evidence of good reputation or good character, that he or they are guilty as charged in the indictment."

The defendants, in attacking this instruction, rely on United States v. Semeniuk, 7 Cir., 193 F.2d 508.

■■■ The instructions given in the two cases are not the same; they are significantly different. Here, the jury was told, in substance, that if, after they considered all of the evidence, including evidence of good character or good reputation, they believed beyond a reasonable doubt that the defendants were guilty, then they should not use good reputation as an excuse to acquit the defendants. In the Semeniuk case, the jury was told that the mere fact that a defendant may have had a good reputation prior to the time of the trial should not be used by the jury as an excuse to acquit him.

Moreover, in the case at bar, the jury was instructed (1) to take into consideration good character and reputation; (2) that evidence of good character "may alone create a reasonable doubt"; and (3) that if from all of the evidence, including evidence of good character and reputation, the jury believed the defendants guilty, then they should not use good character and reputation as an excuse to acquit. The giving of this instruction was not error.

■■■ (b) The court gave the following instruction:

"If you believe that any witness who testified in this case actually took part in the commission of a crime, if in fact you believe from all the evidence that a crime or crimes were committed, then that witness is considered an accomplice and his testimony should be received with care and caution and scrutinized carefully. However, the mere fact that a witness may be an accomplice does not mean that he cannot tell the truth. It only means that you are to examine his testimony with care, and if, having done so, you believe it is the truth, then you are to give it the same credence as the testimony of other witnesses."

Defendants say that the second part of this instruction negates entirely the first part, which they indicate is "half way proper". Inasmuch as this contention was not made before the trial court,[2] defendants are in no position to argue that point here. Furthermore the court followed the above quoted instruction with the following charge:

"The weight and credit to be given to the testimony of a person who has admitted his part in the commission of a crime, if any person had made such admission, and if in fact

---

2. 18 U.S.C.A. rule 30.

you do find that a crime has been committed and that the witness took part in its commission, is for you to decide."

We believe that these instructions, taken as a whole correctly state the law.

In their brief defendants say that "The court refused to give the instruction on accomplices requested by defendants * * *." However, in their brief they do not set forth this instruction or make any further reference to it in argument or otherwise. We therefore have not further considered that statement.

■■■ (c) The court refused to give the following instruction tendered by the defendants:

"The Court instructs the jury that the testimony of one accomplice witness can not be used to corroborate the testimony of another accomplice witness."

As to the first twelve counts each accomplice testified to an independent transaction covered by a separate count. There was no corroboration of such testimony by any *other accomplice*.

The similarity of the methods used by defendants in committing said alleged offenses, and their approximate chronological concurrence, were circumstances which, with other evidence, tended to prove the conspiracy charged in count 13. No accomplice testified directly to the conspiracy offense itself and hence as to the existence or execution of the alleged conspiracy there is no occasion to consider their corroboration, by an accomplice or otherwise. In the structure of an orange each segment is a separate unit, and the peeling encompasses all of the units but is distinct therefrom. Conspiracy as a substantive offense, as charged in count 13, is distinct from the offenses charged in counts 1 to 12 inclusive, which were the objectives of the conspiracy. As we have seen, there was but a single offense charged in the conspiracy count.

For these reasons, this instruction was not applicable to any count in the indictment.

■■■ (d) Over defendants' objections, the court instructed the jury as follows:

"Now, as has been said here several times, this is a criminal case, and the law in such cases is that the defendants come into court presumed to be innocent, and that presumption protects them until such time, if such time shall come, when the jury shall believe from the evidence in the case, beyond any reasonable doubt, that the defendants, or any of them, are guilty as charged in the indictment or some count or counts of the indictment."

Defendants argue that the jury was thus told "that as soon as the presumption of innocence disappeared as to any defendant as to any count, then the presumption of innocence disappeared as to all defendants as to all remaining counts." The instruction could have been made more clear. An obvious effort was made by its draftsman to reconcile the instruction to two facts: first, that there were several defendants, and secondly, that there were several counts being tried. Both of these facts appeared to the jury from the trial proceedings as a whole and from various parts of the judge's charge. Against that background, it is difficult to believe that a jury would interpret this instruction as meaning that the establishment of the guilt of any one defendant on any one count, would *ipso facto* cause the presumption of innocence to disappear as to all the defendants on all the remaining counts. We cannot believe that a jury would give such an unreasonable interpretation to the instruction. Under the circumstances of this case, there was no prejudicial error committed in this respect.

■■■ (e) The court refused the following instruction tendered by defendants:

"The Court instructs the jury that it must consider the evidence

as to each Count separately; and that before it can return a verdict of guilty as to each Count, the jury must be satisfied beyond a reasonable doubt that the Government has proved the allegations as set out in the Indictment in each and every Count."

The trial judge said that he would "cover that generally." The defense claims that he failed to do so, and that the omission was pointed out to the court.

The government contends, however, that in his charge the trial judge, in his own language, correctly instructed the jury on the same subject, as follows:

"You have only one duty to perform, and that duty is to tell the Court whether or not the defendants, or any of them, are guilty or not guilty as charged under the several counts in the indictment."

The court instructed the jury in great detail as to which of various forms of verdict they should use, dealing seperately as to *each* of the three defendants, and separately with respect to the *various* counts. For instance, as to each defendant *by name* he told the jury that, if it found that defendant guilty on some counts and not guilty on others, it should fill in the numbers of the counts in spaces provided in applicable forms of verdict, which were among those which he then delivered to the jury.

We fail to see how any juryman could have avoided knowing, after having heard these instructions, that it was his duty to consider each count separately in order to decide as to the form of verdict to be used. Actually this clear method of delineating the jury's duty as to each count separately was a more practical way of conveying the thought contained in the refused instruction, than the language of that instruction itself. The court's action in this respect was not erroneous.

 (f) Defendants point out that in the course of his long charge to the jury the trial court said:

"The statements of Max Lewis and Paul Echeles are in no way to be considered as any evidence against the defendant Julius L. Echeles.

"I am referring to their written statements which have been received in evidence."

They argue that an inference could be drawn by the jury that it could consider against Julius the oral statements of Lewis and Paul made outside his presence. However, whether there is any evidence to which this inference might be applied to the prejudice of Julius, requires our attention. In their brief defendants cite no oral statements of Lewis or Paul falling within the scope of the inference. On oral argument before us, when counsel for defendants was asked if he could point out any such oral statements, he was unable to do so. The defendants' reply brief refers to oral statements made by Lewis and Paul in which they say Julius was mentioned. However, the record shows that Lewis never mentioned Julius in any statement, oral or written. Paul's oral statements were obtained for the purpose of incorporating them into his written statement, were actually so incorporated, and are thus in evidence. The result is that the substance of the oral statements about which defendants now complain was really covered by that part of the charge which we have quoted. Therefore, under the circumstances of this case, no prejudice to Julius resulted therefrom and there is no reversible error in that respect.

### Conclusion.

For the reasons hereinbefore set forth, we hold that as to counts 1, 10 and 12, the judgments of the district court are reversed; as to counts 2, 3, 4, 5, 6, 8, 9, 11 and 13, the judgments of the district court are affirmed; and as to count 7 the judgment of the district court is affirmed as to Paul Echeles and the judgment of the district court is reversed as to Julius Echeles.

MAJOR, Circuit Judge (dissenting).

I am not unmindful of the exhaustive and careful review which Judge SCHNACKENBERG has made in this case. However, I have a strong feeling that the defendants did not have a fair trial. No good purpose could be served in dissent in discussing my views in detail. The very nature of the case, considering the fact that there were three defendants and a multiplicity of charges, including that of conspiracy, in itself requires, in my view, that the judgment be affirmed only upon a record free from substantial error. Unfortunately, however, we have no such record. Perhaps it can be said that no single error was so prejudicial as to require reversal but, even so, there was an accumulation of errors sufficient to create grave doubt in my mind as to the fairness of the trial.

It appears to me that the defendant Julius Echeles was in all probability seriously prejudiced by statements of his co-defendants offered in evidence. And the denial of the motion for a severance can hardly be excused on the basis that it was not appropriately presented by the defendants for the reason that both the court and the government's counsel had knowledge of the situation; in fact, the government's counsel were well aware of the harmful effect of the procedure employed and they, as well as the court, had a duty to protect the defendants in their right to a fair trial. Admittedly the court had discretion in the matter but, to repeat a part of the quotation used by Judge SCHNACKENBERG from Dauer v. United States, 10 Cir., 189 F.2d 343, 344, "It is only when the situation is such that the exercise of common sense and sound judicial judgment should lead one to conclude that one defendant cannot have a fair trial, as that term is understood in law, that a severance should be granted." That, in my opinion, is precisely the situation which existed as to the defendant Julius Echeles.

The opinion points out the acquittal of the defendant Lewis (only charged in the conspiracy count) as an indication of the intelligent understanding by the jury. Perhaps the jury was not confused as to that defendant but it can be asserted with much certainty that it was in a highly confused state as to the two Echeles defendants. This is evidenced by the fact, as Judge SCHNACKENBERG holds, that there was no competent proof in support of the charges contained in counts 1, 10 and 12, and no competent proof in support of the charge contained in count 7 as to the defendant Julius Echeles. Even so, the jury found these two defendants guilty on all counts, irrespective of proof or the lack thereof. This can fairly be attributed to the fact that the jury was unable to evaluate and properly apply the evidence as among the numerous charges and as among the different defendants. And it must be remembered that this confusing situation in which the jury was placed was the creation of the government and not that of the defendants or their attorneys.

I would reverse the judgment and remand the case for a new trial.